Herman RESNICK, Individually, as Co–Trustee of the F. Resnick Inc. Retirement Plan and Trust and the F. Resnick Inc. Employees' Pension Plan and Trust, and as a Shareholder of F. Resnick Inc. on behalf of himself and all other Shareholders of such Corporation, Plaintiff,

v.

Irving RESNICK, Individually, as Co–Trustee of the F. Resnick Inc. Retirement Plan and Trust and the F. Resnick Inc. Employees' Pension Plan and Trust, as Director of F. Resnick, Inc. on Behalf of F. Resnick Inc., and as a shareholder of F. Resnick Inc. on Behalf of Himself and all other Shareholders of F. Resnick Inc. Similarly Situated and on Behalf of and in the Right of F. Resnick Inc., the F. Resnick Inc. Retirement Plan and Trust and the F. Resnick Inc. Employees' Pension Plan and Trust, Defendants and Third–Party Plaintiffs.

Arnold RESNICK, A. Resnick Textile Co., Inc. and F. Resnick Inc., Additional Defendants,

v.

Steven RESNICK, Max Landa, Resnick & Landa, Inc., F. Resnick Inc. and Manufacturers Hanover Trust Company, Additional Defendants on the Counterclaim.

No. 85 Civ. 9026 (RJW).

United States District Court, S.D. New York.

Sept. 14, 1989.

Julia Barash and Ross & Hardies, New York City (Peter I. Livingston, of counsel), for Irving Resnick.

Field, Lomenzo, Turret & Blumberg, P.C., New York City (Ira A. Turret, of counsel), for Herman Resnick.

Robert M. Rosenblith, New York City (Robin J. Artz, of counsel), for Manufacturers Hanover Trust Co.

## OPINION

ROBERT J. WARD, District Judge.

Defendant and third-party plaintiff Irving Resnick ("Irving") moves for partial summary judgment pursuant to Rule 56, Fed.R.Civ.P., on his 11th counterclaim against plaintiff Herman Resnick ("Herman") as co-trustee of the F. Resnick, Inc. Pension Plan and Trust (the "Pension Plan"), to authorize and direct the Pension Plan to make payment to Irving of the sum of $176,364 plus interest as of March 31, 1989 and on his 13th counterclaim against Herman as co-trustee of the F. Resnick Inc. Retirement Plan and Trust (the "Retirement Plan") and the Pension Plan (collectively "the Plans"), to authorize and direct payment of $50,170.00 plus interest as of March 31, 1989, by the Retirement Plan to the Pension Plan. In addition, Irving seeks reimbursement for the costs and disbursements relating to these two counterclaims, including a reasonable attorney's fee.

Third-party defendant Manufacturers Hanover Trust Company ("MHT") also moves, pursuant to Rules 12(b)(6) and 56, Fed.R.Civ.P., to dismiss the claims asserted against it in Irving's first, third, fourth, fifth, sixth, eighth and ninth counterclaims.[1] These counterclaims allege, respectively, that MHT (1) participated in a civil conspiracy to damage the business of F. Resnick, Inc., (2) aided and abetted Herman to breach his fiduciary duties to F. Resnick, Inc., (3) breached its credi-

---

1. Irving sets forth his claims against MHT in his Answer to the First Amended Complaint and Second Amended Counterclaim and Cross–Claim, filed April 3, 1989, as amended by Stipulation filed May 22, 1989 (the "Answer to the First Amended Complaint"). The claims against MHT are delineated as counterclaims in the Answer to the First Amended Complaint and have been referred to as such by the parties. The Court will follow suit in this decision.

tor/debtor relationship with F. Resnick, Inc., 4) interfered with the contractual relationships between F. Resnick, Inc. and its foreign suppliers and domestic customers, 5) breached MHT's fiduciary duty to F. Resnick, Inc., 6) intentionally inflicted emotional distress on Irving and (7) engaged in willful conduct warranting the imposition of punitive damages. In addition, MHT seeks to restrain and enjoin Irving from relitigating the issues in this motion in any other action or forum, pursuant to Rule 65, Fed.R.Civ.P., and the imposition of sanctions pursuant to Rule 11, Fed.R.Civ.P. Irving has likewise requested that the Court impose Rule 11 sanctions against MHT for filing this motion. For the reasons that follow, both motions are granted in part and denied in part.

## BACKGROUND

The factual underpinnings of this long standing and acrimonious feud between the Resnick brothers were detailed in this Court's Memorandum Decision, dated May 18, 1988, ("May 18, 1988 Memorandum Decision") and will only be briefly reiterated here.[2]

Herman and Irving jointly operated the family business, F. Resnick, Inc. ("F. Resnick" or "the Company"), since the death of their father in 1954, each with his wife owning fifty percent of the shares of the Company. The Company operated as an importer and distributor of woolen and synthetic materials to clothing manufacturers in the United States. Irving and Herman were also co-trustees of the Retirement Plan, a defined contribution plan under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* (1984) and the Pension Plan, a defined benefit plan and qualified employee pension plan under section 401 of the IRS Code, 26 U.S.C. § 401, *et seq.*

In 1982, a dispute erupted between the brothers over the running of the Company. An attempt to resolve this dispute through an arrangement wherein Herman was either to submit a proposal to buy Irving's shares in the Company or to sell his shares to Irving (the "buy/sell agreement"), resulted in Irving's filing of the first of a series of lawsuits. This initial action, seeking specific performance of the buy/sell agreement, and a second action, also brought by Irving, seeking judicial dissolution of the Company pursuant to section 1104 of the Business Corporation Law of New York, were filed in the Supreme Court, New York County in or about August, 1982 and February, 1984, respectively.

*Irving's Vested Benefits in the Pension Plan*

On March 15, 1983, as Herman and Irving continued to bicker over the operation of the Company, Irving apparently reached normal retirement age as defined by the Pension Plan. Exhibit C, annexed to Declaration of Julia Barash, filed May 24, 1989 at ¶ 2(r) ("Barash–Decl."). At this time, Standard Security Life Insurance Company of New York ("SSL"), performed or supervised all actuarial and administrative funcions for the Pension Plan. Affidavit of Irving Resnick, filed May 24, 1989 at ¶ 10 ("Irving–Aff."). SSL prepared a retirement benefits options sheet for Irving, Ex. F annexed to Barash–Decl., which was delivered to him in July of 1983. Irving–Aff. at ¶ 11. SSL calculated that Irving was entitled to a gross lump sum payment of $1,086,835.00, less the cash value of certain insurance policies Irving had already received in the amount of $49,764.00, leaving a net lump sum entitlement of $1,037,-011.00 plus interest. Ex. H annexed to Barash–Decl.

---

**2.** Familiarity with the Court's May 18, 1988 Memorandum Decision is presumed. In that decision, the Court granted partial summary judgment in favor of Herman with respect to his first claim and directed Irving, as co-trustee of the Plans, to authorize and direct the Plans to make full payment to Herman of his vested accrued benefits due through one year prior to the termination of the Plans. The amount of benefits due Herman was to be calculated by CMS Pension Associates, Inc., an actuarial firm hired to terminate the Plans. The Court denied summary judgment with respect to benefits which may have accrued to Herman during the year the Plans were terminated, as well as to all other claims.

Irving claims he then advised SSL that he desired an immediate lump sum distribution of the amount to which he was entitled under the Pension Plan. Herman disputes this contention, asserting that Irving has previously sworn that he was undecided as to whether to retire during 1983 because of the pending litigation, and therefore, would not have asked for an immediate lump sum payment. Rule 3(g) Statement of Herman Resnick, filed on July 5, 1989 at ¶ 1 ("Herman–3(g)"). It is undisputed that payment to Irving did not occur.

Herman maintains that the calculations by SSL were tentative, as they were stated to be "to the best of our knowledge" in a letter from SSL to MHT, dated September 6, 1983, which detailed Irving's entitlement under the Pension Plan. Ex. G annexed to Barash–Decl. MHT, which acted as the investment advisor for the Plans, maintained the accounts for the Plans from 1981 until 1985. Irving contends that MHT would not release the funds without the consent of Herman, the co-trustee, and Herman refused to sign a letter approving the lump sum distribution during 1983. 3(g) Statement of Irving Resnick, filed on May 24, 1989 at ¶ 15; Irving–Aff. at ¶ 14.

Herman denies having been approached by Irving regarding authorization for a lump sum payment until March 20, 1984, at which time he signed an undated letter and forwarded it to MHT. Herman–3(g) at ¶ 4; Ex. J annexed to Barash–Decl. MHT did not release any funds to Irving upon receipt of this letter because it believed a Notice of Intent to Terminate the Plans had been filed and that release of funds prior to the approval of the termination by the Pension Benefit Guaranty Corporation ("PBGC") would be improper. Ex. R annexed to Barash–Decl.

On or about March 20, 1984, the Company adopted several resolutions designed to settle the litigation then pending between the brothers. Ex. J annexed to Barash–Decl. These resolutions provided, among other things, for the dissolution of the Company and for the retention of CMS Pension Associates, Inc. ("CMS"), an out-side actuarial firm with an expertise in pension design and administration, to terminate the Plans. *Id.* The two state supreme court actions were then discontinued by stipulation, the first action with prejudice and the second action without prejudice.

In terminating the Pension Plan, CMS calculated the benefits due to all remaining participants, including Irving. CMS's calculation of Irving's benefits differed from SSL's calculation, providing for a smaller lump sum payment in the amount of $1,059,096.00, less the cash value of the insurance policies, for a total entitlement of $1,009,332.00. CMS detailed its calculation of Irving's entitlement to Pension Plan benefits in a letter, dated June 8, 1984, addressed to Irving's son and attorney, Arnold Resnick. Ex. N annexed to Barash–Decl.

In order to obtain approval for termination of the Plans, in or about June 1984, CMS prepared a Form 5310 Notice of Intent to Terminate the Pension Plan ("Form 5310") in accordance with section 4041 of ERISA. Pursuant to the requirements of Form 5310, participant data schedules were attached to the application to terminate the Pension Plan. These schedules set forth the amount of benefits each participant was entitled to receive as calculated by CMS, not SSL, and included the $1,009,332.00 lump sum payout for Irving. Under penalties of perjury, both Herman and Irving signed Form 5310, declaring that they had examined the application, including the accompanying statements, and to the best of their knowledge and belief, the information contained therein was true, correct, and complete. Ex. L annexed to Barash–Decl.

On August 14, 1984, the PBGC issued a notice of sufficiency approving the termination of the Pension Plan. Subsequently, the IRS approved the termination as well. On December 28, 1984, Irving received his remaining vested benefits as calculated by CMS under the Pension Plan, including interest at five percent (5%) on his lump sum

payment.[3] A deficiency of $5356.00 in the payment to Irving was discovered and Irving was informed of this error in a letter from CMS dated October 31, 1988. Ex. U annexed to Barash–Decl. Irving received a corrective payment of this sum, plus interest at 5%, amounting to $6,484.00, in or about February, 1989.

CMS determined that a 5% interest rate was to be applied to all the sums payable under the Pension Plan, not the actual interest earned by the funds. CMS applied this 5% rate, leaving open the possibility of revaluation at a higher interest rate for all Pension Plan participants in the event there were excess funds left after the initial distribution. Affidavit of Charles M. Stipelman, filed July 5, 1989 at ¶¶ 16–17. This 5% interest rate was applied by CMS to determine the actual payment due both Irving and Herman.

*Payments Due the Pension Plan from the Retirement Plan*

In November, 1983, Herman erroneously made a $16,000 deposit to the Retirement Plan that should have been made to the Pension Plan. Irving–Aff. at ¶ 25; Affidavit of Herman Resnick, filed July 5, 1989 at ¶ 9 ("Herman–Aff."). During July 1985, Herman and Irving each co-signed letters to Gloria Alicea ("Alicea") and Manuela Garrett ("Garrett"), two employees of F. Resnick. Ex. V annexed to Barash–Decl. These letters explained that Alicea was to receive $2,690.00 from the Pension Plan and $17,634.00 from the Retirement Plan and Garrett was to receive $1,276.00 from the Pension Plan and $7,236.00 from the Retirement Plan. Irving maintains that these checks were drawn on the wrong account. He has not produced copies of the checks in support of his claim, but has produced bank statements for the Plans which indicate that (1) miscellaneous debits were incurred by the Retirement Plan during July 1985 in the amount of $3,966.00, which corresponds with the amount due Alicea and Garrett from the Pension Plan, and (2) miscellaneous debits were incurred

by the Pension Plan during July 1985 in the amount of $26,245.00, which was slightly higher than the amount due Alicea and Garrett from the Retirement Plan. Ex. W annexed to Barash–Decl.

*MHT's Involvement with F. Resnick's Business Operations*

For a period of approximately twenty years, F. Resnick maintained a credit line with MHT for the purpose of opening letters of credit for its suppliers and borrowing funds for its operations. During 1982 and 1983, F. Resnick factored its accounts receivable through Chase Manhattan Bank, N.A. ("Chase") and Manufacturers Hanover Commercial Corporation ("MHCC"), a wholly owned subsidiary of MHT. F. Resnick's indebtedness to MHT was secured by an assignment of its factored accounts receivable at Chase and MHCC and the personal unlimited guarantees of its two principals, Irving and Herman.

During or prior to February, 1983, Herman informed MHT that he would no longer personally guarantee F. Resnick's debt. Affidavit of Herman Resnick, filed May 25, 1989 at ¶¶ 3, 7; Ex. L annexed to Statement of Robin Arzt, filed May 25, 1989 at 52, 81. Also in February, 1983, Irving requested that MHT open a letter of credit for approximately $80,000.00 to $90,000.00 for the account of F. Resnick. David S. Gordon ("Gordon"), a district manager for MHT during this time, refused to issue the letter of credit due to Herman's withdrawal of his personal guarantee. Gordon asserts he informed Irving several times that additional collateral would be necessary to secure the letter of credit because Herman had withdrawn his guarantee. Affidavit of David S. Gordon, filed on May 25, 1989 at ¶ 4. Irving insists that Gordon told him MHT would no longer extend credit to F. Resnick on any terms because Herman had withdrawn his guarantee, and claims Gordon never suggested a letter of credit could be secured by obtaining additional collateral. Affidavit of Irving Resnick, filed June 23, 1989 at ¶¶ 26–27, 29, 31 ("Irving–

---

**3.** Irving also received payment from the Retirement Plan, but has not challenged the amount of that payment.

Aff. in Opposition"). No further letters of credit were extended to F. Resnick from MHT after this time.

On or about March 18, 1983, the Max Landa Textile Co. was incorporated. Effective January 4, 1984, this company changed its name to Resnick and Landa, Inc. ("Resnick & Landa"). Resnick & Landa is an importer and distributor of woolen and synthetic materials to clothing manufacturers in the United States. Herman's son, Steven Resnick, and Max Landa, both former employees of F. Resnick, served respectively as President and Secretary of Resnick & Landa.

According to Irving, the principals of Resnick & Landa began operating the competing company prior to its formal incorporation and conspired with MHT to obtain business which otherwise would have been obtained by F. Resnick. Irving–Aff in Opposition at ¶ 31. Irving alleges that MHT financed transactions of Resnick & Landa and required Herman personally to guarantee the letters of credit it issued Resnick & Landa knowing Herman was an officer and director of F. Resnick and that F. Resnick would be damaged by Resnick & Landa's business. Irving also contends that MHT knew the two companies were competing for the same customers and suppliers because it factored invoices for Resnick & Landa during 1983. Furthermore, Irving maintains MHT stood to profit by diverting business away from F. Resnick toward Resnick & Landa because it handled the bulk of the new company's financial transactions. These assertions are contested by MHT, which claims Irving has produced invoices which show only a tiny fraction of the total business done by Resnick & Landa in 1983 involved third-parties who had prior dealings with F. Resnick.

MHT never informed Irving of its involvement with Resnick & Landa or its requirement that Herman personally guarantee the letters of credit issued to Resnick & Landa. Irving charges that the failure to disclose this information was part of the conspiracy to destroy F. Resnick, while MHT counters that it had a duty of confidentiality to Resnick & Landa not to disclose these banking transactions to Irving.

*Procedural History*

The squabbling between the Resnick brothers did not end with the settlement agreement and the dismissal of the first two state court actions. Instead, on November 15, 1985, Herman brought the instant action, seeking, *inter alia*, to recover his vested accrued benefits under the Retirement Plan and Pension Plan. Irving filed an Answer, Counterclaim and Cross–Claim in or about February, 1986. On or about February 16, 1988, Irving began a fourth action in the Supreme Court, New York County, naming MHT, as well as Herman, Resnick & Landa, and others as defendants (the "Fourth Action"). The Fourth Action was brought by Irving and his wife on their own behalf and on behalf of the shareholders of F. Resnick. By Order dated October 14, 1988, the state court stayed the Fourth Action pending an adjudication of the similar claims raised in this lawsuit.

On February 10, 1989, Irving filed a First Amended Answer, Counterclaims and Cross–Claims to the instant action which added MHT as a defendant on the counterclaims. Prior to MHT serving and filing an answer to Irving's initial pleading against it, Herman filed a First Amended Complaint. On April 3, 1989, Irving filed his Answer to the First Amended Complaint, again asserting claims against MHT and the other third-party defendants. By Stipulation, filed May 22, 1989, the Answer to the First Amended Complaint was amended to insert specific allegations that many of Irving's counterclaims were also brought as shareholder derivative claims on behalf of F. Resnick.

## DISCUSSION

A court may grant the extraordinary remedy of summary judgment only when it is clear both that no genuine issue of material fact remains to be resolved at trial and that the movant is entitled to judgment as a matter of law. Rule 56, Fed.R.Civ.P. In deciding the motion, the Court is not to resolve disputed issues of fact, but rather,

while resolving ambiguities and drawing reasonable inferences against the moving party, to assess whether material factual issues remain for the trier of fact. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–250, 106 S.Ct. 2505, 2509–2511, 91 L.Ed.2d 202 (1986)). Only if "no reasonable trier of fact could find in favor of the nonmoving party" should summary judgment be granted. *H.L. Hayden Co. of New York, Inc. v. Siemens Medical Systems, Inc.*, 879 F.2d 1005, 1011 (2d Cir.1989). In other words, only where the entire record would inevitably lead a rational trier of fact to find for the moving party is summary judgment warranted. *National Railroad Passenger Corp. v. City of New York*, 882 F.2d 710, 713 (2d Cir.1989).

While the party seeking summary judgment bears the burden of demonstrating the lack of material factual issues in dispute, *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983), "the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) (per curiam).

Although the movant faces a difficult burden to succeed, motions for summary judgment, properly employed, permit a court to terminate frivolous claims and defenses, and to concentrate its resources on meritorious litigation. *Knight v. U.S. Fire Ins. Co., supra*, 804 F.2d at 12. The motion then:

> is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Fed.Rule Civ.Proc. 1.... Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons oppos-

ing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

Once the moving party has demonstrated the absence of any genuine issue of material fact, the non-moving party must establish " 'specific facts showing that there is a *genuine issue for trial.*' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Rule 56(e), Fed. R.Civ.P.; emphasis supplied in *Matsushita* ).

### A. *Eleventh Counterclaim—Irving's Entitlement to an Additional Payment From the Pension Plan*

The Pension Plan grants the participants a nonforfeitable right to their accrued benefits upon the attainment of normal retirement age, as defined in the Pension Plan. The parties dispute only the amount of the benefits to which Irving is entitled. Irving maintains that the figure calculated by SSL, plus the actual interest earned on this lump sum by the Pension Plan, accurately reflects his entitlement, not the payment he already received based on CMS's calculations. Irving argues that he is still owed the balance between the lump sum determined by SSL, including the actual interest on that sum, and the lump sum determined by CMS utilizing an interest rate of 5%.

Herman contends that: (1) the SSL calculation was tentative and did not establish any entitlement for Irving, (2) the parties agreed to hire CMS to terminate the Pension Plan and distribute the benefits to the participants, including Irving, and CMS did so fairly, applying the same neutral standards to all the participants, and (3) Irving waived any right to contest the amount of his entitlement by attesting to the accuracy of CMS's calculations when he signed Form 5310 and by accepting the payment from the Pension Plan as calculated by CMS.

Material issues of fact clearly remain concerning this claim, precluding summary

judgment. Most significantly, (1) Irving has presented no proof as to the propriety of SSL's calculation of his benefits, (2) Irving and Herman continue to dispute the intent behind the adoption of the corporate resolution to engage CMS to terminate the Plans, and (3) Irving has failed sufficiently to explain why CMS's calculation of his benefits should be disregarded after he attested to its accuracy. Accordingly, the motion for summary judgment on this claim is denied.

## B. *Thirteenth Counterclaim—Payment from the Retirement Fund to the Pension Fund*

■ Irving and Herman do not dispute that the Pension Plan is owed money from the Retirement Plan, but they do dispute the amount of that indebtedness. Irving claims that the Pension Plan is owed $50,170.00 plus interest as of March 31, 1989. This figure includes $16,000 of Pension Plan funds deposited to the Retirement Plan by mistake, an adjustment for the improper debits made to the Pension and Retirement Plans for Alicea and Garrett, plus the actual interest Irving claims these funds earned while on deposit.[4] Irving has asserted in his calculation that the miscellaneous debits on the July 1985 Pension Plan bank statement include the total payment to Alicea and Garret which should have been made from the Retirement Plan, plus the full fee charged by CMS for its services in arranging both the Pension and Retirement Plan payouts. Ex. W & Y annexed to Barash–Decl.[5] Irving, however, does not provide any evidence that the miscellaneous debit to the Pension Plan in July 1985 included a fee from CMS for both Plan transactions, or even that CMS charged a fee for these transactions at all.

Herman maintains the correct amount owed to the Retirement Plan is $44,836.00, which equals $16,000.00 plus all the July 1985 payments to Alicea and Garrett from both Plans, without interest. This figure, however, does not reflect the actual overpayment by the Pension Plan or what the Retirement Plan currently owes the Pension Plan. Nevertheless, it does reflect an agreement by Herman with Irving's claim that the $16,000 deposit and the payments to Alicea and Garret resulted in an excess of funds in the Retirement Plan at the expense of the Pension Plan.

Accordingly, the motion for summary judgment on Irving's thirteenth counterclaim is granted to the extent that Irving and Herman, as co-trustees of the Plans, shall authorize and direct payment from the Retirement Plan to the Pension Plan in the amounts of $16,000.00 and $20,904.00, plus the actual interest earned by these sums in the Plans from the date of their erroneous deposit or withdrawal, plus any charges levied by CMS and paid by the Pension Plan which are attributable solely to transactions involving the Retirement Plan. All documents necessary to effectuate the legal transfer of the funds and to enable CMS to confirm what charges it levied against the Plans and the actual rate of interest earned by the funds shall be made available by the co-trustees. Irving and Herman are further directed to confer in order to reach agreement on the final sum to be paid to the Pension Plan and to

---

4. The difference between the amount withdrawn from the Pension Plan and the amount withdrawn from the Retirement Plan equals the

| | Alicea | Garret |
|---|---|---|
| Pension Plan: | $17,634.00 | 7,236.00 |
| Retirement Plan: (−) | 2,690.00 | 1,276.00 |
| Total Due Pension Plan: | 14,944.00 | (+) 5,960.00 = 20,904.00 |

5. The July 1985 Pension Plan bank statement indicates a miscellaneous debit of $26,245.00, which is greater than the total sum ($24,870.00) owed to Alicea ($17,634.00) and Garrett ($7,236.00) from the Retirement Plan. The excess funds, amounting to $1,375.00, Irving attributes to CMS's fee for both Plan payouts. Irving has taken half of this excess ($688.00)

amount due the Pension Plan by the Retirement Plan for each employee. That amount is $20,904, calculated as follows:

and added it to the difference between the payments made from the Plans ($20,904.00) to reach a total due the Pension Plan of $21,592.00 from the July 1985 transactions. Ex. Y annexed to Barash–Decl.

submit a stipulation or a status letter to the Court indicating the amount calculated by CMS or agreed upon by the parties on or before October 13, 1989.

### C. *MHT's Motion to Dismiss Irving's Counterclaim*

MHT moves to dismiss the claims asserted against it in Irving's first, third, fourth, fifth, sixth, eighth and ninth counterclaims, or for summary judgment on these claims.

#### 1. *Eighth Counterclaim—Intentional Infliction of Emotional Distress*

■ The eighth counterclaim for intentional infliction of emotional distress is the only claim asserted against MHT by Irving individually. This claim is governed by the one year statute of limitations for intentional torts contained in New York Civil Practice Law and Rules ("CPLR") § 215. *See Koster v. Chase Manhattan Bank, N.A.,* 609 F.Supp. 1191, 1198 (S.D.N.Y. 1985). MHT's refusal to issue a letter of credit to F. Resnick upon Irving's request occurred in or about February, 1983. While Irving maintains that the facts behind MHT's actions were hidden by MHT until the spring of 1987, it is clear that he knew of MHT's refusal to issue the letter of credit and the effect MHT's alleged actions had on F. Resnick in 1983. In any event, this action was not commenced against MHT until February 10, 1989. Irving has presented no agreement by MHT to impute the date of the filing of the 1988 state court action to the counterclaims asserted against MHT in this action or to otherwise waive the statute of limitations defense. Accordingly, the eighth counterclaim against MHT is time-barred and must be dismissed.

■ In addition, Irving's allegations do not set forth a claim for intentional infliction of emotional distress by MHT. Such a claim requires allegations that MHT's conduct was so extreme and egregious as to exceed all bounds of decency and civilized behavior. *Id.* at 1197–98; *Fischer v. Maloney,* 43 N.Y.2d 553, 557, 402 N.Y.S.2d 991, 992–93, 373 N.E.2d 1215 (1978).

A factor's refusal to extend additional credit to a company in financial trouble is not outrageous conduct which can give rise to liability for infliction of emotional distress. *See Garner v. William Iselin & Co., Inc.,* 141 A.D.2d 429, 430–31, 529 N.Y. S.2d 772, 774 (1st Dept.1988) (allegations that defendants conspired to destroy company by reneging on commitment to advance credit were insufficient to support claim for infliction of emotional distress). Irving's allegations that MHT refused to extend a letter of credit and failed to disclose its dealing with Resnick & Landa do not amount to the type of outrageous conduct "regarded as atrocious and utterly intolerable in a civilized community" necessary to maintain such a claim. *See Fischer v. Maloney, supra,* 43 N.Y.2d at 557, 402 N.Y.S.2d at 993, 373 N.E.2d 1215 (quoting Restatement (Second) of Torts, § 46(1), Comment d). Irving has indicated no other activities by MHT which would satisfy the elements of this cause of action. Accordingly, this counterclaim is dismissed.

■ All of the other counterclaims against MHT are asserted by Irving on behalf of F. Resnick as shareholder derivative claims. MHT challenges Irving's capacity to bring these claims on F. Resnick's behalf because Irving failed to make a demand upon the F. Resnick board of directors that they authorize F. Resnick to pursue this action against MHT directly. The requirement of a demand on directors is designed to afford the derivative corporation the opportunity to pursue the action itself, prevent strike suits by minority shareholders, and minimize undue interference with corporate management. *See Ohman v. Kahn,* 685 F.Supp. 1302, 1306 (S.D. N.Y.1988). However, a demand on directors need not be made where it would be futile. *Id.* A demand is "presumptively futile where the directors are antagonistic, adversely interested, or involved in the transaction attacked." *Lewis v. Graves,* 701 F.2d 245, 248 (2d Cir.1983). Herman and his wife controlled half of the stock and half the board of directors of F. Resnick. The claims asserted by Irving against MHT are intimately tied to allegations that Herman was guilty of wrongdo-

ing and is also liable to the Company. Under these circumstances, it appears that a demand to bring suit would have been futile. Accordingly, the failure to make such a demand is not fatal to Irving maintaining these claims on behalf of F. Resnick in a shareholder derivative action.

### 2. First, Third, and Fourth Counterclaims

 The first counterclaim alleges that MHT participated in a civil conspiracy to damage the business of F. Resnick. There is no substantive tort of civil conspiracy in New York. *Sterling Nat'l Bank & Trust Co. of New York v. Federated Dep't Stores, Inc.*, 612 F.Supp. 144, 146 n. 1 (S.D.N.Y.1985). Conspiracy is a rule of responsibility for the tortious actions of others which broadens the reach of traditional torts by connecting a defendant with the acts and declarations of his or her co-conspirators. *Bridge C.A.T. Scan Assoc. v. Ohio–Nuclear Inc.*, 608 F.Supp. 1187, 1193 n. 11, (S.D.N.Y.1985). New York law provides, however, that a defendant may be held liable for a conspiracy to do an unlawful thing, or to do a lawful thing in an unlawful manner. *Arlinghaus v. Ritenour*, 622 F.2d 629, 639 (2d Cir.), *cert. denied*, 449 U.S. 1013, 101 S.Ct. 570, 66 L.Ed.2d 471 (1980); *Bridge C.A.T. Scan Assoc. v. Ohio–Nuclear Inc.*, *supra*, 608 F.Supp. at 1193 n. 11 ("Liability of a civil conspirator depends upon whether the overt acts alleged are actionable under traditional tort theories of recovery, or whether a lawful end has been effected in an unlawful manner"). The overt acts producing damage to plaintiff give rise to liability, not the existence of the conspiracy itself. *See Sterling Nat'l Bank & Trust Co. of New York, v. Federated Dep't Stores, Inc.*, *supra*, 612 F.Supp. at 146 n. 1.

Irving asserts that the general conspiracy charge put forth in the counterclaim can be construed as a claim that MHT participated in a conspiracy to defraud F. Resnick by unlawfully forming the directly competing business of Resnick & Landa and diverting the business of F. Resnick and its line of credit to the new firm. The elements of common law fraud in New York are (1) misrepresentation of a material fact, (2) falsity of that representation, (3) scienter, (4) reasonable reliance on the representation and (5) damages. *See Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 (2d Cir.1987); *Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir.1980) *cert denied*, 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981).

The third counterclaim alleges that MHT aided and abetted Herman to breach his fiduciary duties owed to F. Resnick. "Under New York law, three elements must be asserted in order to state a claim for aiding and abetting: (1) an allegation that the principal/third-party violated the law; (2) an allegation that defendant knew or should have known that the violation was occurring; and (3) an allegation that defendant's conduct gave substantial assistance or encouragement to defendant to engage in tortious conduct." *Beneficial Commercial Corp. v. Murray Glick Datsun Inc.*, 601 F.Supp. 770, 772 (S.D.N.Y.1985).

The fourth counterclaim alleges that MHT breached its contractual duty of good faith and fair dealing owed to F. Resnick by terminating the line of credit while conspiring to launch the competing business of Resnick & Landa. In every contract there is an implied covenant of good faith and fair dealing which precludes each party from engaging in conduct that will deprive the other party of the benefits of the agreement. *Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir.1980).

Taking the allegations in the complaint as true, it does not appear beyond doubt that these counterclaims fail to state a claim upon which relief can be granted and therefore dismissal is inappropriate under Rule 12(b)(6). *See e.g., Dwyer v. Regan*, 777 F.2d 825, 829 (2d Cir.1985).

 Furthermore, for each of these three claims, Irving maintains that summary judgment is improper because he has not been afforded the opportunity to undertake full discovery of MHT and much of the information germane to these claims lies solely in the possession of MHT and its employees. There are several discrepan-

cies in the factual stories presented by Irving and MHT regarding the refusal to issue the letter of credit, the activities of Herman and MHT and their influence on MHT's credit decision, and MHT's knowledge of the alleged effect of Resnick & Landa's business on F. Resnick. While much of Irving's position is unsubstantiated by evidence other than his own self-supporting affidavits, the motion for summary judgment on these claims was prematurely filed prior to the completion of discovery. Accordingly, summary judgment on the first, third and fourth counterclaims is denied at this time, without prejudice to renewal upon the completion of discovery.[6]

### 3. *Fifth Counterclaim—Interference with Contract Relations*

■ The fifth counterclaim alleges that MHT, by its refusal to open a letter of credit upon Irving's request, interfered with the contractual relationships of F. Resnick and its suppliers and customers. The elements of a cause of action for tortious interference with a contract are (1) the existence of a valid contract between plaintiff and a third-party, (2) defendant's knowledge of that contract, (3) defendant's intentional procuring of the breach of that contract by the third-party and (4) damages. *E.g. Israel v. Wood Dolson Co.*, 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 5, 134

N.E.2d 97 (1956). A cognizable claim is stated for interference with prospective contract relations when a plaintiff alleges that "but for the interference he or she would have been able to enter into the contract or that the contract would have come into being." *Zeigan v. Blue Cross & Blue Shield of Greater New York*, 607 F.Supp. 1434, 1437 (S.D.N.Y.1985).

Irving does not identify a single contract which was breached by a third-party due to MHT's actions. In addition, he fails to demonstrate that MHT's actions made the performance of a contract more difficult or lessened F. Resnick's enjoyment of the benefits of a contract and therefore cannot avail himself of even an expansive standard for stating a tortious interference with contractual relations claim. *See Airship Industries (UK) Ltd. v. Goodyear Tire & Rubber Co.*, 643 F.Supp. 754, 761 (S.D.N.Y. 1986).[7]

Irving asserts that F. Resnick lost at least one transaction it otherwise would have obtained from a customer because it did not have a letter of credit from MHT. Irving–Aff. in Opposition at ¶ 28. No facts are offered to support this alleged loss of business or to explain why F. Resnick could not have obtained credit from another financial institution to secure this particular transaction. The information concerning F. Resnick's contractual dealings with

---

**6.** MHT argues that these counterclaims are barred by the statute of limitations. In New York, the limitations period for a claim based upon fraud is six (6) years under CPLR § 213(8). Aiding and abetting an officer or director of a corporation to breach his fiduciary duties also carries a six (6) year limitations period pursuant to CPLR § 213(7). *See Dolmetta v. Uintah National Corp.*, 712 F.2d 15, 19 (2d Cir.1983). The claim for breach of the covenant of good faith and fair dealing is grounded in contract and likewise has a limitations period of six (6) years, pursuant to CPLR § 213(2).

Irving first filed his claims in this action against MHT on February 10, 1989. In that pleading, Irving asserted these same shareholder derivative claims on behalf of F. Resnick against MHT. The Answer to the Amended Complaint, filed on April 3, 1989, initially omitted the shareholder derivative allegations, but these were added by stipulation. The current shareholder derivative claims relate back to the date of the filing of the initial pleading against MHT, February 10, 1989. *See* Rule 15(c), Fed.

R.Civ.P. MHT has not shown that the refusal to issue a letter of credit to F. Resnick in February, 1983 occurred prior to the tenth day of the month. Accordingly, the Court cannot conclude the claims filed against MHT on February 10, 1989 were time-barred.

In any event, CPLR § 203(f) provides that a fraud-based action may be maintained within two years after the actual or imputed discovery of the facts of the fraud. Irving claims he only discovered MHT's involvement in the conspiracy to destroy F. Resnick in the spring of 1987, less than two years before filing his claim. Accordingly, the fraud claim was also timely filed pursuant to CPLR § 203(f).

**7.** While Irving has made allegations concerning the actions of Herman and Resnick & Landa which might state an interference with contractual relations claim, Irving–Aff. in Opposition at ¶¶ 30, 32, he has failed to indicate that MHT was in any way involved in these alleged transactions.

third-parties and the effect of MHT's conduct on its contractual relations is within the control of F. Resnick, not MHT. Therefore, the failure to provide any factual support for this claim warrants the granting of summary judgment. Accordingly, the fifth counterclaim against MHT is dismissed.

### 4. *Sixth Counterclaim—Breach of Fiduciary Duties*

The sixth counterclaim alleges that MHT had a fiduciary relationship with F. Resnick and breached its fiduciary duties by failing to extend credit to F. Resnick and to disclose its dealings with Resnick & Landa. The typical relationship between a bank and a customer is that of creditor and debtor and the lender does not owe a fiduciary duty to the customer. *See Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 122 (2d Cir.1984). Despite this general principle, the development of a fiduciary relationship between a bank and a customer may be possible if they have a sufficiently close association. *See Weinberger v. Kendrick*, 698 F.2d 61, 79 (2d Cir.1982), *cert. denied*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983).

There is no dispute that F. Resnick used MHT for certain financial services over a long period of time. However, there is also no indication that MHT exercised any degree of control over F. Resnick or that MHT and F. Resnick engaged in anything other than arms-length business transactions. Furthermore, Irving admits that MHT was not F. Resnick's exclusive bank and that the Company used Chase to factor most of its accounts in 1983. The information regarding F. Resnick's relationship with MHT is readily available to Irving, yet he has failed to provide sufficient facts for the Court reasonably to infer that a fiduciary relationship existed. Accordingly, the sixth counterclaim must also be dismissed.[8]

Both Irving and MHT have cavalierly asserted that Rule 11 sanctions should be imposed on their adversary. These requests are denied. The Court cautions Irving, however, that should discovery not produce a good faith factual basis for his counterclaims against MHT, Rule 11 sanctions may well be appropriate in the event he continues to press these claims.[9]

## CONCLUSION

Irving's motion for partial summary judgment on his eleventh counterclaim against Herman as trustee for the Pension Plan is denied because genuine issues of material fact exist. Summary judgment is granted on Irving's thirteenth counterclaim to the extent that Irving and Herman, as co-trustees of the Plans, shall authorize and direct payment from the Retirement Plan to the Pension Plan in the amounts of $16,000.00 and $20,904.00, plus the actual interest earned by these sums in the Plans from the date of their erroneous deposit or withdrawal, plus any charges levied by CMS and paid by the Pension Plan which are attributable solely to transactions involving the Retirement Plan. MHT's motion for summary judgment is granted on the fifth, sixth, and eighth counterclaims asserted against it by Irving individually and as a shareholder derivatively on behalf of F. Resnick. The balance of MHT's motion to dismiss the remaining claims against it asserted in the first, third and fourth counterclaims is denied without prejudice to renewal upon the completion of discovery. MHT's further application for an order pursuant to Rule 65 is denied at this time, as are the requests for Rule 11 sanctions made by Irving and MHT.

8. The ninth counterclaim attempts to assert a cause of action for punitive damages. Punitive damages, however, are not a separate cause of action under New York law. This counterclaim incorporates the allegations of the previous counterclaims, and punitive damages can be construed as an additional prayer for relief on those claims which are still outstanding.

9. MHT's motion for an order pursuant to Rule 65 restraining Irving from relitigating these issues in any other forum is denied without prejudice to renewal upon the full adjudication of the issues raised in this case. The Court notes this request for an injunction may become moot because Irving's attorney has indicated Irving will stipulate not to reopen and try the Fourth Action in the event this case is adjudicated on the merits or voluntarily settled. Statement of Julia Barash, filed June 23, 1989 at ¶ 21.

**40**

Irving and Herman are directed to confer in order to reach agreement on the final sum to be paid to the Pension Plan and to submit a stipulation or a status letter to the Court indicating the amount calculated by CMS or agreed upon by the parties on or before October 13, 1989. The parties are to complete discovery on all remaining claims by December 19, 1989 and file a pretrial order by January 20, 1990.

It is so ordered.