In re GRANITE PARTNERS, L.P.,
Granite Corporation, and Quartz
Hedge Fund, Debtors.

Harrison J. GOLDIN, Trustee, Plaintiff,

v.

PRIMAVERA FAMILIENSTIFTUNG,
TAG ASSOCIATES, LTD., Mark L.
Friedman, Andrew Malloy, Information
Systems & Networks Corporation, and
Roma Malkani, Defendants.

Bankruptcy Nos. 94 B 41683
to 94 B 41685 (SMB).
Adv. No. 95/1646A.

United States Bankruptcy Court,
S.D. New York.

April 9, 1996.

As Corrected April 16, 1996.

Willkie Farr & Gallagher, New York City (Benito Romano, John R. Oller, of counsel), for Plaintiff.

Gold Bennett & Cera LLP., San Francisco, California (Solomon B. Cera, of counsel), Sutherland Asbill & Brennan, New York City (Michael J. Levin, of counsel), for Primavera Familienstiftung.

Newman Tannenbaum Helpern Syracuse & Hirschtritt LLP., New York City (Vincent J. Syracuse, Ralph A. Siciliano, David A. Pellegrino, of counsel), for TAG Associates, Mark L. Friedman and Andrew Malloy.

Cleary Gottlieb Steen & Hamilton, New York City (Thomas Moloney, Bernadette Miragliotta, of counsel), for Kidder Peabody & Co., Inc.

## MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART THE TRUSTEE'S MOTION FOR A PRELIMINARY INJUNCTION

STUART M. BERNSTEIN, Bankruptcy Judge.

This case may again prove the adage that something too good to be true probably isn't. Harrison J. Goldin, the chapter 11 trustee of the three debtors, seeks to enjoin the prosecution of two lawsuits and one arbitration brought by disgruntled investors and creditors against the debtors' insiders and third party broker/dealers. He primarily contends that the claims that these parties assert belong to the estate, and their continued prosecution violates the automatic stay. In the alternative, he argues that we should enjoin these actions.

The parties prosecuting the underlying lawsuits counter that the claims they assert are direct and personal.[1] Further, the doctrine of *in pari delicto* bars the trustee from raising them. Thus, they aim to bypass the bankruptcy process and recover their lost investments or uncollectible claims directly from the defendants.

We grant the trustee's motion to the extent of enjoining the prosecution of the waste, mismanagement and breach of fiduciary duty claims against Granite's former principals and the claim that the defendant broker/dealers improperly liquidated Granite's portfolios. We also grant the motion to enjoin the arbitration. We deny the motion in all other respects.

### FACTS

We start with the facts in the class action complaint filed by Primavera Familienstiftung ("Primavera").[2]

---

1. The petitioner in the arbitration never responded or opposed the trustee's preliminary injunction motion.

2. Primavera commenced its civil action in the United States District Court for the Northern District of California, but the case has been

## A. The Parties

Granite Partners, L.P. ("Granite Partners") is a Delaware limited partnership, and Granite Corporation and Quartz Hedge Fund ("Quartz") are Cayman Island corporations. Except when necessary to distinguish among them, the three debtors are referred to collectively as Granite.

The plaintiff class, which has not been certified, consists of persons who invested in Granite after January 26, 1993, and still held their interests on March 30, 1994. (Primavera Compl. ¶ 1.)[3] Although not entirely clear from the complaint, the investors did not own the securities in the Granite portfolios. Instead, an investor received stock in Granite Corporation or Quartz, or a limited partnership interest in Granite Partnership.[4] Granite, in turn, owned the securities in the portfolios.

At all relevant times, the defendant David J. Askin controlled Granite directly or indirectly through the defendant Askin Capital Management, L.P. ("ACM") (Id. ¶ 3.)[5] ACM acted as the investment advisor to Granite Partners and Granite Corporation beginning on January 26, 1993, and to Quartz after its formation on December 8, 1993, (id. ¶ 14), until the commencement of these cases in April 1994. ACM is Granite Partners' sole general partner. Askin is Granite Corporation's sole voting shareholder and sole director, and Quartz's sole voting shareholder and one of its two directors. ACM employed the defendant Geoffrey S. Bradshaw–Mack as its Director of Marketing. Askin, ACM and Bradshaw–Mack are referred to collectively as the Askin Parties.

The defendants also include three broker/dealers: Kidder, Peabody & Co., Incorporated, Bear, Stearns & Co., Incorporated and Donaldson, Lufkin & Jenrette Securities Corporation (collectively, the "Brokers"). The Brokers created and sold "derivatives," *viz.* securities derived from mortgage-related securities.

## B. Granite's Business and its Relationship with the Brokers

All three debtors were formed for the purpose of investing primarily in mortgage-related securities and their derivatives. The Brokers created "tranches" or classes of derivatives from the cash flow generated by a single pool of home loan mortgages. (Primavera Compl. ¶ 30.) Each pool might "support" several tranches.

The derivatives attracted investors because, in theory, at least some reacted uniquely to interest rate fluctuations. As a rule, the value of debt securities rises as interest rates fall, and *vice versa.* (Id.) The value of these derivatives, on the other hand, were supposed to correspond directly (rather than inversely) to the movement in interest rates. (Id.) Accordingly, an investor could hedge against the usual effects of interest rate changes by purchasing these derivatives for its portfolio. (Id. ¶¶ 31–33.) If the portfolio contained the right mix of debt securities, it could make money regardless of how interest rates moved. (Id.)

These derivatives formed the cornerstone of the Askin Parties' investment strategy and appeal. The Askin Parties represented to potential investors that they had computer models and the expertise to assemble risk-free, market neutral portfolios. (Id. ¶ 34.) This, they said, allowed the portfolios to earn consistent returns regardless of how interest rates moved. Indeed, the promotional literature they issued touted their strategy as a

---

transferred to this district. It is pending before District Judge Robert W. Sweet. See *Primavera Familienstiftung v. Askin, et al.*, 95 Civ. 8905 (RWS).

**3.** "Primavera Compl." refers to the complaint filed by Primavera in the civil action now pending before Judge Sweet.

**4.** For instance, Primavera invested $1 million in Granite Corporation stock on March 1, 1994.

**5.** ACM is a Delaware limited partnership. Its sole general partner is Dashtar Corporation, and Askin is the sole shareholder of Dashtar.

"no lose" proposition. (*Id.* ¶¶ 34–36.) As a result of these representations, Primavera invested $1 million in Granite Corporation stock, and the class members invested the aggregate amount of $650 million in Granite. (*Id.* ¶ 59.)

The Brokers had an enormous financial incentive to prop up Granite and increase Granite's ability to purchase the derivatives that the Brokers created and sold. The Brokers earned substantial underwriting revenue marketing their derivatives, and Granite played a pivotal role as an outlet for the Brokers' least marketable tranches referred to in the industry as "toxic waste." (*Id.* ¶ 38.) Granite was among the first customers for these novel and risky tranches that were so new that they had yet to experience a drop in interest rates. (*Id.* ¶ 42.)

The Brokers went to great lengths to prop up Granite's purchasing power. In so doing, they allegedly breached their contractual and fiduciary obligations to Primavera and the class members. In particular, they abandoned their internal guidelines and offered Granite extensive credit through margin purchases and reverse repurchase agreements, securing Granite's repayment obligations with the securities in the portfolios. (*Id.* ¶¶ 52–54.) As a result, Granite leveraged $650 million in securities up to a $2 billion aggregate portfolio. (*Id.* ¶ 48.)

### C. The Collapse of Granite

On February 4, 1994, the Federal Reserve Bank raised interest rates. Accordingly, the value of most debt securities presumably fell. Contrary to expectations, however, the value of the derivatives that Granite purchased as a hedge also fell, and the value of the portfolios declined rapidly. (*Id.* ¶ 57.) During this period, the Askin Parties misrepresented Granite's performance to existing and potential investors. (*Id.* ¶ 58.) In addition, ACM and Askin sold some of the more bearish securities that had partially maintained their prices, leaving the portfolios completely unbalanced by the end of February. (*Id.* ¶ 57.)

By March 30, 1994, Granite could not meet the Brokers' margin calls.[6] The Brokers rushed to auction off the securities in the Granite margin and repurchase accounts. Because the Brokers "dumped" large amounts of the Granite securities on the market, they liquidated the collateral at severely distressed prices unrelated to their intrinsic values. (*Id.* ¶ 63.)

The Brokers also purchased portions of their own collateral through "deemed sales." (*Id.* ¶ 62.) To establish a "purchase price," they sought bids from each other or from other brokerage firms in the middle of the night. (*Id.* ¶ 63.) After they "purchased" the securities, they quickly resold them at substantial profits. (*Id.*) In addition, the Brokers sold less volatile Treasury notes in the Granite portfolios, with their rush to liquidate adversely impacting the notes' yields and prices. (*Id.* ¶ 64.)

By April 7, 1994, Granite lay in shambles. Stripped of most of their assets by the liquidation sales and facing litigation commenced by disgruntled brokers, the three debtors filed chapter 11 petitions on that day. In light of the need for an independent investigation, we appointed Mr. Goldin as chapter 11 trustee on May 27, 1994. Since then, he has investigated the matters alleged in the Primavera complaint, as well as other potential claims on behalf of the estate. He has not yet completed his final report, and seeks to enjoin these investor and creditor lawsuits because, he maintains, they infringe on the claims he alone has standing to pursue, or otherwise frustrate the reorganization.

### DISCUSSION

#### A. Introduction

The trustee stands in the shoes of the debtor. He may bring any suit that the debtor could have brought before bankruptcy.[7] *Hirsch v. Arthur Andersen & Co.,* 72

---

6. Because the mortgage-backed derivatives were not traded on an exchange, they lacked ascertainable market prices. Instead, the Brokers determined the market price, and "marked" the securities in the portfolio "to market." (Primavera Compl. ¶¶ 53–54.) As the sole arbiters of the price, the Brokers could generate a margin call simply by reducing the "marks."

7. The "case or controversy" requirement imposed under Article III of the United States Constitution coincides with the scope of the trustee's

F.3d 1085, 1093 (2d Cir.1995); *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 118 (2d Cir.1991). Under section 544,[8] the trustee also stands in the overshoes of the creditors. *Podell & Podell v. Feldman (In re Leasing Consultants, Inc.),* 592 F.2d 103, 110 (2d Cir.1979). Section 544(a) grants the trustee the status, *inter alia,* of a hypothetical judicial lien creditor as of the petition date. Section 544(b) authorizes the trustee to avoid any transfer that an actual creditor holding an allowable claim could avoid under applicable law. Section 544, however, does not extend beyond avoidance actions, *see* 4 Lawrence P. King, *et al., Collier on Bankruptcy* ¶ 544.01, at 544–3 (15th ed. 1995) ("Collier"), and does not permit the trustee to assert the personal, direct claims of creditors for the benefit of the estate or for a particular class of creditors. *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d at 118; *see Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 434, 92 S.Ct. 1678, 1688, 32 L.Ed.2d 195 (1972) (under Chapter X of the former Bankruptcy Act, trustee lacked standing to sue indenture trustee on behalf of debenture holders); *E.F. Hutton & Co. v. Hadley,* 901 F.2d 979, 985 (11th Cir. 1990) (trustee lacks standing to assert claims of debtor's customer creditors).

 State law determines which claims belong to the estate, and hence, can be asserted by the trustee.[9] *Hirsch v. Arthur Andersen & Co.,* 72 F.3d at 1093; *Sobchack v. American Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.),* 17 F.3d 600, 607 (2d Cir.1994); *Kalb, Voorhis & Co. v. American Fin. Corp.,* 8 F.3d 130, 132 (2d Cir.1993); *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.,* 884 F.2d 688, 700 (2d Cir.1989). If the cause of action belongs to the estate, the trustee has exclusive standing to assert it; conversely, if the cause of action belongs solely to the shareholders or creditors, the

---

powers granted by the Bankruptcy Code. *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1091 (2d Cir.1995); *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 118 (2d Cir.1991).

8. Section 544 of the Bankruptcy Code provides:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;
(2) a creditor that extends to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or
(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.
(b) The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

9. Granite Corporation and Quartz were formed under Cayman Islands law. None of the parties, however, pleaded or otherwise raised the applicability of Cayman Island law to the standing issue. *See* Fed.R.Civ.P. 44.1 (made applicable by Fed.R.Bankr.P. 9017). We nevertheless invited submissions from the parties regarding whether Cayman Islands law differed from American law on the standing and *in pari delicto* issues discussed in detail in the succeeding text. The Brokers submitted an affidavit of a Cayman Islands attorney, and the trustee referred us to relevant English and Cayman Islands cases on the subject. We conclude that the Cayman Islands law and the English law from which it derives recognize the same distinction between direct and derivative actions, particularly in connection with mismanagement claims, that exists under American law. *See Scultz v. Reynolds,* 1992–93 CILR 59, 63–64 (Ct.App.1992) (adopting the English rule enunciated in *Foss v. Harbottle,* 67 E.R. 189 (1843)), *Gee v. Attridge,* 1987 CILR 342, 347–48 (Grand Ct.1987); Affidavit of Angus John Elliot Foster, sworn to Feb. 16, 1996, at ¶¶ 7–9. Neither the Brokers nor the trustee submitted any specific authority regarding the existence of the doctrine of *in pari delicto* under Cayman Islands law, nor argued that Cayman Islands law does not recognize the principle. Accordingly, we also apply American law to resolve this issue. *Cf. Loebig v. Larucci,* 572 F.2d 81, 85 (2d Cir.1978) (where "no evidence has been presented as to foreign law, New York courts have decided the cases in accordance with New York law.").

trustee has no standing to assert it. *Schertz–Cibolo–Universal City, Indep. Sch. Dist. v. Wright (In re Educators Group Health Trust)*, 25 F.3d 1281, 1284 (5th Cir. 1994). Where the trustee has standing to sue, the automatic stay prevents creditors or shareholders from asserting the claim notwithstanding that outside of bankruptcy, they have the right to do so. *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d at 701–02; *Keene Corp. v. Coleman (In re Keene Corp.)*, 164 B.R. 844, 851–52 (Bankr. S.D.N.Y.1994).

■ To determine standing, the court must look to the nature of the wrongs alleged in the complaint without regard to the plaintiff's designation, *Lipton v. News Int'l, Plc,* 514 A.2d 1075, 1078 (Del.1986); *accord Kramer v. Western Pac. Indus., Inc.*, 546 A.2d 348, 352 (Del.1988); *see generally* 12B William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations,* § 5911, at 484 (1993) ("Fletcher"), and the nature of the injury for which relief is sought. *In re Educators Group Health Trust,* 25 F.3d at 1284; *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1349 (7th Cir. 1987), *cert. denied,* 485 U.S. 906, 108 S.Ct. 1077, 99 L.Ed.2d 237 (1988); *accord In re E.F. Hutton Southwest Properties II, Ltd.*, 103 B.R. 808, 812 (Bankr.N.D.Tex.1989).

■ Where a corporation suffers an injury, and the shareholders suffer solely through a diminution in the value of their stock, the claim belongs to the corporation. *Vincel v. White Motor Corp.*, 521 F.2d 1113, 1118 (2d Cir.1975); *see Griffin v. Bonapfel (In re All American of Ashburn, Inc.)*, 805 F.2d 1515, 1518 (11th Cir.1986); 12B *Fletcher,* § 5913, at 501. Where, however, the third party's wrong inflicts an injury on stockholder's rights rather than on the corporation, the stockholder may seek direct relief in its own favor against the third party. *In re Ionosphere Clubs, Inc.*, 17 F.3d at 605. This can occur in two situations: where the allegedly wrongful conduct violates a separate duty to the complaining shareholder independent of the fiduciary duties that the wrongdoer owes to all of the shareholders, or where the conduct causes an injury to the plaintiff distinct from any injury to the cor-

poration. *Cowin v. Bresler,* 741 F.2d 410, 415 (D.C.Cir.1984); *see generally* 12B *Fletcher* § 5921, at 519–20. The inquiry turns on whether the other shareholders have suffered the same injury in their role as shareholders. *In re Ionosphere Clubs, Inc.*, 17 F.3d at 604. Finally, analogous rules distinguish between direct and derivative actions in the limited partnership context. *Lenz v. Associated Inns & Restaurants Co.*, 833 F.Supp. 362, 380 n. 18 (S.D.N.Y.1993); *Litman v. Prudential–Bache Properties, Inc.*, 611 A.2d 12, 15 (Del. Ch.1992); *see, e.g., Boxer v. Husky Oil Co.*, 429 A.2d 995, 997 (Del.Ch.1981) (noting similarity between fiduciary duties of general partners and corporate directors); *Strain v. Seven Hills Assocs.*, 75 A.D.2d 360, 370, 429 N.Y.S.2d 424, 431 (1st Dep't 1980) ("In determining whether a cause of action is derivative in nature regarding limited partnership law, the case law relevant to corporation law may be looked to for guidance.").

■ A shareholder who suffers an injury particular to itself can maintain an individual action even though the corporation also suffers an injury from the same wrong. *Lipton v. News Int'l, Plc,* 514 A.2d at 1079. The shareholder may, however, have to await the bankruptcy court's disposition of the common claim since the shareholder cannot measure its injury until then. *Cf. Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1106 (2d Cir.1988) (corporate creditor asserting RICO claim against corporate debtor's principals must await bankruptcy court's disposition of trustee's claim based on same wrongful conduct— through recovery of the transferred assets, abandonment or some other means—before the creditor's claim will accrue), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989).

■ Finally, in deciding whether to issue an injunction, we look solely to the allegations in the complaint. *E.g., Apostolou v. Fisher,* 188 B.R. 958 (N.D.Ill.1995) (reversing bankruptcy court injunction granted in favor of trustee on ground that the creditor's complaint alleged personal claims which the trustee lacked standing to pursue); *Official Unsecured Creditors' Comm. v. Bowen (In re*

*Phar–Mor, Inc. Sec. Litig.*), 164 B.R. 903 (W.D.Pa.1994) (denying motion to enjoin debtor's investors' lawsuit against debtor's former auditors on ground that investors' asserted direct, personal claims); *cf. Kalb, Voorhis & Co. v. American Fin. Corp.*, 8 F.3d at 134–35 (dismissing creditor's alter ego claim on the ground that only the trustee had standing to assert it). In so doing, we assume their truth, and do not presume to invade the province of the two district courts where the actions are pending. Thus, we do not pass on the legal sufficiency of the claims. Further, we do not necessarily rule that if the trustee lacks standing, Primavera or anyone else has it.[10] Finally, we do not credit conclusory allegations that are belied by more specific allegations. *Hirsch v. Arthur Andersen & Co.*, 72 F.3d at 1092.

## B. The Primavera Complaint

### 1. Introduction

The Primavera complaint asserts the following eight claims:

1. *Against all defendants for securities fraud* (under § 10(b) of the Securities Exchange Act (the "1934 Act") and Rule 10b–5) based upon (a) the Askin Parties (i) fraudulently inducing the class members to invest in Granite, (ii) failure to hedge the Granite portfolios, and (iii) excessive leveraging of the portfolios, and (b) the Brokers (i) flagrant departure from their standards of ordinary care, (ii) violation of their own internal credit guidelines and (iii) encouragement of excessive leveraging to enable the investment in the most speculative tranches of securities;

2. *Against all defendants other than Bradshaw–Mack for control person liability* (under section 20(a) of the 1934 Act) based upon Askin's and ACM's exercise of their power to direct and manage Granite and the Brokers exercise of their power to direct and manage Askin and ACM;

3. *Against all defendants for common law fraud* based upon the Askin Parties' material misrepresentations and omissions and the Brokers (a) creating and selling the "toxic waste," (b) encouraging and enabling Granite to purchase such securities, (c) unreasonably extending credit to the Funds, (d) violating their internal credit guidelines and (e) flagrantly departing from the standard of ordinary care in their administration of Granite's trading accounts;

4. *Against the Askin Parties for their negligent misrepresentations* in connection with inducing the class members to invest in Granite;

5. *Against Askin and ACM for breach of their fiduciary obligations* by managing the portfolios in a fraudulent manner, failing to hedge and excessively leveraging the portfolios;

6. *Against the Brokers for aiding and abetting the breach of fiduciary obligations* by encouraging and enabling ACM and Askin to excessively leverage the portfolios and purchase the most speculative tranches of mortgage derivative securities;

7. *Against the Brokers for third party beneficiary breach of contract claims* (arising out of the margin and reverse repurchase agreements between Granite and the Brokers), based upon their failure to (a) extend credit in a reasonable manner, (b) fairly and reasonably mark the value of the Granite securities, (c) fairly liquidate the portfolios, and (d) purchase the securities for their own accounts at prices that reflected their intrinsic value; and

8. *Against the Brokers for liquidating the portfolios in a commercially unreasonable manner.*

The eight claims describe three types of wrongful conduct. First, the Askin Parties and the Brokers fraudulently induced Primavera and the class members to invest in Granite.[11] Second, the Askin Parties, aided

---

**10.** For example, the Brokers argue that if the doctrine of *in pari delicto* bars the trustee from asserting Primavera's claims, it also bars shareholders such as Primavera. We defer to the district court on this issue because our inquiry ends once we determine that the Primavera claims are not property of the estate, and their assertion does not violate the automatic stay.

**11.** Primavera also charges that Granite failed to disclose the poor performance of the portfolios following the rise in interest rates. Our disposition of this claim—to the extent it is intended as

and abetted by the Brokers, mismanaged the Granite portfolios. The complaint focuses on three specific areas: Askin and ACM bought toxic waste, failed to hedge, and overleveraged the portfolios. Third, the Brokers liquidated the portfolios in a commercially unreasonable manner.

### 2. The Fraudulent Inducement Claims

■ The fraudulent inducement claims, alleged primarily although not exclusively in the First through Fourth Claims, are direct and belong to shareholders such as Primavera. *See Cumberland Oil Corp. v. Thropp,* 791 F.2d 1037, 1042 (2d Cir.) (creditor's fraudulent inducement claim against debtor's principal is a direct claim and is not property of the estate), *cert. denied,* 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986); *In re Phar–Mor, Inc. Sec. Litig.,* 164 B.R. at 905 (claims of investors seeking damages allegedly in reliance on erroneous audit opinions state distinct and personal claims against the debtor's accountants); *Begier v. Price Waterhouse,* 81 B.R. 303, 305–06 (E.D.Pa.1987) (dismissing trustee's claim against debtor's accountants who, the trustee alleged, should have known that their negligently performed audits would be distributed to and relied upon by the debtor's lenders and other creditors). The trustee lacks standing to assert these claims, and Primavera can do so without violating the automatic stay.

### 3. The Waste, Mismanagement and Breach of Fiduciary Duty Claims

#### a. Property of the Estate

■ The second category of claims raises more difficult questions. Although Primavera frequently describes this conduct as "fraudulent," the specific allegations depict acts of mismanagement, waste and breach of fiduciary duty that resulted in the dissipation of Granite's assets—the portfolios. Such claims ordinarily belong to and can only be enforced by the corporation or through a shareholder's derivative action.

For example, in *Litman v. Prudential–Bache Properties, Inc.,* 611 A.2d 12 (Del.Ch. 1992), an action with many analogies to the

Primavera complaint, the plaintiff limited partners sued the general partners charging breach of fiduciary duty. The limited partnership had been formed for the purpose of investing in first mortgage bonds. *Id.* at 13. The partnership invested nearly $135 million but the real estate projects suffered overruns and delays, and often failed to pay principal and interest required by the bonds. *Id.* at 14. The plaintiffs alleged that the general partners "breached their fiduciary duties by inadequately investigating and monitoring the investments and by placing their interests in fees above the interests of the limited partners." *Id.* at 16. The complaint did not allege an injury arising from the breach of a distribution agreement with the limited partners, but instead, that the misconduct resulted in diminished income to the partnership, diminished distributions to the limited partners and diminished value to the limited partnership interests. *Id.*

The court concluded that the claims were derivative in nature, and belonged to the partnership rather than the limited partners. The diminished income represented a direct injury to the partnership, damaging the limited partners only to the extent of their proportionate interest in the partnership. *Id.* Similarly, the diminished distributions and diminished value of the interest in the partnership flowed from the direct injury to the partnership. None of the alleged injuries existed independently of the partnership or were inflicted directly on the limited partners. *Id.* Accordingly, the claims were derivative in nature. *Id.* at 16–17; *accord Lenz v. Associated Inns & Restaurants Co.,* 833 F.Supp. at 380–81 (transactions either unprofitable or involving self-dealing, that allegedly cause the limited partner lost income and diminished the value of his investment, are derivative); *Abeloff v. Barth,* 119 F.R.D. 332, 334 (D.Mass.1988) (general partners' failure to pursue partnership claims against others and their paying unreasonable management fees were derivative); *Kramer v. Western Pac. Indus., Inc.,* 546 A.2d at 353 (mismanagement resulting in corporate waste through the dissipation of corporate

---

a claim—is the same as the primary fraudulent inducement claim.

funds alleges derivative claims that the shareholders experience only indirectly).

▆▆▆ Once bankruptcy ensues, these claims become property of the estate, and the trustee alone can assert them. *Pepper v. Litton,* 308 U.S. 295, 307–08, 60 S.Ct. 238, 245–46, 84 L.Ed. 281 (1939); *Koch Ref. v. Farmers Union Cent. Exch. Inc.,* 831 F.2d at 1343; *In re Keene,* 164 B.R. at 853; *AP Indus., Inc. v. SN Phelps & Co. (In re AP Indus., Inc.),* 117 B.R. 789, 801 (Bankr. S.D.N.Y.1990); *see generally* 12B *Fletcher* § 5913, at 501. In addition, if the law of the state of incorporation permits, the corporation can also sue third parties who aid and abet the insiders' wrongful conduct. *Lou v. Belzberg,* 728 F.Supp. 1010, 1023 (S.D.N.Y. 1990); *Terrydale Liquidating Trust v. Barness,* 611 F.Supp. 1006, 1015 (S.D.N.Y.1984); *see AmeriFirst Bank v. Bomar,* 757 F.Supp. 1365, 1380 (S.D.Fla.1991); Restatement (Second) of Torts § 876 (1982). New York recognizes the aiding and abetting claim, *see, e.g., Crowthers McCall Pattern, Inc. v. Lewis,* 129 B.R. 992, 999 (S.D.N.Y.1991); *Resnick v. Resnick,* 722 F.Supp. 27, 37 (S.D.N.Y.1989), as does Delaware. *See, e.g., Weinberger v. Rio Grande Industries, Inc.,* 519 A.2d 116, 131 (Del.Ch.1986); *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1057 (Del.Ch.1984), *aff'd,* 575 A.2d 1131 (Del.1990).

#### b. *In pari delicto*

▆▆▆ It appears, therefore, that only the trustee can maintain the second category of claims in the nature of mismanagement, waste and breach of fiduciary duty against Granite's insiders and the Brokers. If so, Primavera's assertion of these same claims violates the automatic stay, and must be enjoined. However, claims that insiders and third parties acted in concert to defraud investors raise special concerns, and require consideration of the doctrine of *in pari delicto*.[12] The doctrine is based on two premises: courts should not mediate disputes between wrongdoers, and denying judicial relief to a wrongdoer deters illegal conduct. *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 306, 105 S.Ct. 2622, 2626–27, 86 L.Ed.2d 215 (1985); *Ross v. Bolton,* 904 F.2d 819, 824 (2d Cir.1990). State law determines if it applies. *See O'Melveny & Myers v. FDIC,* — U.S. —, —, 114 S.Ct. 2048, 2053, 129 L.Ed.2d 67 (1994) (state law determines whether to impute bank's knowledge of its attorneys' wrongdoing to FDIC, suing the attorneys as receiver of the bank, for malpractice and breach of fiduciary duty). If *in pari delicto* applies,[13] the trustee cannot sue the third parties for injuries that the corporation suffered in connection with the fraudulent scheme.

Two recent Second Circuit cases considered the applicability of *in pari delicto* to investor fraud cases. In *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114 (2d Cir.1991), the insider formed the debtor—which he alone controlled—to trade securities. *Id.* at 116. Through the debtor, he solicited loans from others, issued notes to them, and used the proceeds to make trades in the debtor's accounts which it had opened with Shearson. *Id.* Shearson granted the insider the use of an office, a desk and a video monitor. *Id.* Neither the debtor nor the insider were registered brokers or investment advisors. *Id.* As a result, the trades made with the loan proceeds violated Connecticut law. *Id.* When Shearson learned this, it closed the debtor's account and terminated the insider's use of the office and equipment. *Id.* at 116–17.

After the debtor filed for bankruptcy, the debtor's noteholders sued Shearson. *Id.* at 117. The debtor's trustee thereafter filed a demand for arbitration asserting contractual claims stemming from the Customer Agreements between the debtor and Shearson. *Id.* The trustee also maintained that Shearson had breached its fiduciary duty to the debtor. *Id.* Specifically, Shearson knew that the

---

**12.** *In pari delicto* is short for *in pari delicto potior est conditio defendentis:* "In the case of equal or mutual fault [between two parties] the condition of the party ... [defending] is the better one." *Black's Law Dictionary* 791 (6th ed. 1990).

**13.** The doctrine does not apply when the trustee stands in the shoes of a hypothetical or actual creditor and sues under 11 U.S.C. § 544. *In re Leasing Consultants, Inc.,* 592 F.2d at 110; *Wedtech Corp. v. Nofziger (In re Wedtech Corp.),* 88 B.R. 619, 622 (Bankr.S.D.N.Y.1988).

trading in the debtor's accounts was not suitable for the debtor, manipulated the insider into excessively speculative trading by disregarding account opening rules and verification requirements and by providing an office and equipment, and controlled the insider by allowing him to trade highly leveraged funds thereby gaining high commissions. *Id.* In addition, the trustee accused Shearson of churning the debtor's accounts. *Id.* Shearson commenced a civil action for injunctive relief to stop the arbitration. *Id.* The district court granted preliminary and permanent injunctive relief against the trustee on statute of limitations grounds, and the trustee appealed. *Id.*

After reviewing the demand for arbitration, the Court of Appeals concluded that the trustee had standing to assert the churning claim because the debtor would have had standing to do so. *Id.* at 119. The Court reached the opposite conclusion regarding the claim that Shearson aided, abetted and unduly influenced the insider to make bad trades that dissipated corporate funds. The Court relied on two grounds. First, to the extent that the trustee alleged damages to the debtor's clients, the claims belonged only to the clients. *Id.* at 119–20.

 Second, to the extent the arbitration demand alleged damages to the debtor, the trustee still lacked standing. The insider— the debtor's sole stockholder and decisionmaker—knew about the bad investments and actively forwarded them. "A claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." *Id.* at 120; *accord Barnes v. Schatzkin,* 215 A.D. 10, 212 N.Y.S. 536 (1st Dep't 1925), *aff'd,* 242 N.Y. 555, 152 N.E. 424, *cert. denied,* 273 U.S. 709, 47 S.Ct. 100, 71 L.Ed. 852 (1926). In addition, Shearson owed no fiduciary duty to the debtor other than to execute the requested trades because the accounts were nondiscretionary. *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d at 120.

More recently, the Court reached a similar result in *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085 (2d Cir.1995). The case arose out of the Colonial Realty bankruptcy. The former principals of the debtor had already pled guilty to various types of fraud. *Id.* at 1088. Hirsch, the trustee, sued Arthur Andersen, the debtor's former accountants, charging that it had assisted, aided and abetted the debtor's principals in connection with a Ponzi scheme involving the syndication of real estate limited partnership interests. *See id.* at 1088–90. After the district court held that the trustee lacked standing, and dismissed the complaint, the trustee appealed.

The Court of Appeals affirmed. Initially, it separated the complaint into its two component claims: (1) distributing misleading offering memoranda and (2) providing deficient professional services. *Id.* at 1092. As to the first, the fraud claims belonged to creditors under state law and involved injuries particular to them. *Id.* at 1093. The Court relied on *E.F. Hutton & Co. v. Hadley,* 901 F.2d 979 (11th Cir.1990). The *Hadley* court held that claims arising out of a Ponzi scheme belonged to the investors rather than the trustee, and the trustee's action would duplicate the investors' litigation. *Id.* at 986–87. Similarly, in *Hirsch,* the Colonial Realty investors were vigorously pursuing litigation on their own. Hence, only the investors could assert them to the exclusion of the trustee. *Hirsch v. Arthur Andersen & Co.,* 72 F.3d at 1094.

The Court held that the trustee also lacked standing to assert the professional malpractice claims. The Court agreed with the district court that "there is likely to be little significant injury that accrues separately to the Debtors in this case." *Id.* In addition, any recovery would go to creditors and the debtors would not participate. *Id.* Finally, even if the debtor did suffer an independent injury, "we are persuaded that the *Wagoner* rule should be applied here, and that Hirsch is precluded from asserting the professional malpractice claims alleged in the Complaint because of the Debtors' collaboration with the defendants-appellees in promulgating and promoting the Colonial Ponzi schemes." *Id.* In a footnote, the Court distinguished Hirsch's malpractice claim from the churning claim in *Wagoner.* The latter, it stated, was "clearly distinct from the alleged fraud perpetrated against the bankrupt corporation's investors," whereas Arthur Anderson's

alleged wrongdoing was "closely tied" to the subsequent Ponzi scheme. *Id.* at 1094–95 n. 6.

Mr. Goldin makes several arguments why *in pari delicto* does not apply here. First, it generally applies to Ponzi schemes or other illegal transactions. *See Apostolou v. Fisher,* 188 B.R. at 969 (collecting cases); *see, e.g., Hirsch v. Arthur Andersen & Co.,* 72 F.3d at 1094 (Ponzi scheme); *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d at 119–20 (illegal trading); *Mediators, Inc. v. Manney (In re Mediators, Inc.),* 190 B.R. 515, 528 (S.D.N.Y.1995) (diversion of assets); *CEPA Consulting, Ltd. v. King Main Hurdman (In re Wedtech Corp.),* 138 B.R. 5, 8–9 (S.D.N.Y. 1992). Second, he does not concede the facts necessary to support the application of the doctrine. Third, Askin (or ACM) was not the debtor's only shareholder, *compare In re Mediators, Inc.,* 190 B.R. at 528 (*in pari delicto* bars debtors' creditors' committee from pursuing aiding and abetting claims because debtor's sole shareholder and decisionmaker consented to and participated in the transactions that form the basis of the claim) *with In re Wedtech Corp.,* 138 B.R. at 8 (denying motion for summary judgment to dismiss trustee's claims against debtor's former accountants, based on lack of standing, on ground that the guilty insiders were not the debtor's sole shareholders and a factual issue existed regarding their agency).

 We agree that Primavera does not allege the type of illegal Ponzi scheme that characterized *Hirsch,* or even the illegal trading found in *Wagoner.* Nevertheless, we conclude that its allegations nevertheless bring it within the *in pari delicto* doctrine. First, unlike the trustee, we cannot distinguish between criminal and non-criminal fraudulent conduct, or between wrongful conduct committed by legitimate or illegal entities. It suffices that the law imputes to the corporation the knowledge and conduct of the guilty insider; a corporation only acts through its agents, and the imputation of the agent's wrongful conduct lies at the heart of *in pari delicto. Gordon v. Basroon (In re Plaza Mortgage & Fin. Corp.),* 187 B.R. 37,

45 (Bankr.N.D.Ga.1995); *see Mirror Group Newspapers, plc. v. Maxwell Newspapers, Inc. (In re Maxwell Newspapers, Inc.),* 164 B.R. 858, 865–66, 870 (Bankr.S.D.N.Y.1994); *cf. Cenco, Inc. v. Seidman & Seidman,* 686 F.2d at 454 ("[A] participant in a fraud cannot also be a victim entitled to recover damages.").

Having rejected this distinction, we find that Primavera's complaint mirrors the *Wagoner* pleading, and cannot be distinguished. Primavera charges that the Brokers ignored their own credit guidelines, and encouraged Askin and ACM to overleverage the portfolios and use the loan proceeds to purchase speculative tranches of toxic waste. The Brokers knew that the trades were unsuitable (Primavera Compl. ¶ 37), but did so anyway because they earned substantial underwriting fees. In substance, the Brokers aided, abetted and influenced Askin and ACM in making bad trades that dissipated the portfolios. *Wagoner* involved almost identical allegations against Shearson. *See* 944 F.2d at 117, 119.

Second, although the trustee refuses to concede the facts necessary to the *in pari delicto* claim, we consider this immaterial. It is true that in many of the *in pari delicto* cases, the trustee filed the complaint detailing the insider's wrongdoing, and the Court could determine from the trustee's own allegations whether *in pari delicto* applied. *See, e.g., Hirsch v. Arthur Andersen & Co.,* 72 F.3d at 1092; *In re Mediators, Inc.,* 190 B.R. at 520; *Apostolou v. Fisher,* 188 B.R. at 963. It does not follow that if the defrauded party files the complaint, we must conclude that *in pari delicto* does not apply. Our analysis remains the same: if we assume the truth of the allegations, *i.e.,* that Primavera can prove everything that it alleges, is Primavera entitled to recover, or in the alternative, does the claim as alleged belong to the trustee? We do not require the trustee's concession to perform this analysis, because our analysis does not foreclose the trustee from suing the Brokers based on the same wrongdoing and alleging claims that do not invoke application of *in pari delicto.*[14]

---

**14.** At oral argument, we raised this possibility,

suggesting that the Brokers could face inconsis-

Third, the application of *in pari delicto* does not depend on Askin's (or ACM's) status as Granite's sole shareholder. Defrauded shareholders can invoke *in pari delicto* to protect their own standing or challenge the trustee's. *Cf. Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (dismissing trustee's complaint against debtor's former accountant that also alleges general partners' participation in Ponzi scheme because claims belong to debtor's investor-limited partners). If defrauded shareholders can invoke *in pari delicto,* the doctrine necessarily applies even if the culpable insider is not the only shareholder.

Further, the Primavera complaint, and other filings which allow our judicial notice, demonstrate that Askin, directly, or indirectly through ACM, is Granite's sole decisionmaker. He is the sole voting shareholder of Granite Corporation and Quartz, and he is the sole general partner of Granite Partners, two generations removed through Dashtar and ACM. The Primavera complaint alleges that Askin controlled Granite, directly or indirectly through ACM, and made all of their investment and other decisions. No one other than Askin or ACM acted on behalf of Granite in connection with the matters alleged in Primavera's complaint.[15]

### c. Broker Domination and Control

Primavera also alleges, however, that the Brokers controlled Askin and ACM. *In pari delicto* does not apply if the third party dominated or controlled the actions of

the insider. In *Kalb, Voorhis & Co. v. American Fin. Corp.*, 8 F.3d 130, 133 (2d Cir. 1993), a creditor filed a veil-piercing action on behalf of a bankrupt corporation against a former controlling shareholder who moved to dismiss. On appeal from a district court order that granted the motion, the Second Circuit affirmed. After concluding that under Texas law, the *alter ego* claim belonged to the debtor, Judge Pollack, writing for the Court, dismissed the contention that *in pari delicto* barred the debtor from asserting the *alter ego* claim:

> [W]here the parties do not stand on equal terms and one party controls the other, the *in pari delicto* doctrine does not apply.... The *in pari delicto* defense does not apply to such actions because the essential element of such claims is that a controlling shareholder forced the corporation to act for the benefit of the shareholder through domination and control. Because Appellant alleges that AFC [the defendant] dominated and controlled Circle K [the debtor], the *in pari delicto* doctrine would not bar Circle K from asserting an *alter ego* claim, and an individual creditor such as Appellant has no standing to assert an *alter ego* claim.

8 F.3d at 133 (internal citations omitted).

In *Hirsch,* however, the Court rejected a similar claim and distinguished *Kalb.* The complaint included inconsistent allegations that Arthur Andersen placed its "own man" with Colonial to monitor and control the prin-

---

tent, adverse judgments. Ultimately, the trial on the merits will dictate who, as between the trustee and Primavera, had standing to sue the Brokers and recover a judgment if the facts demonstrate their wrongdoing. It depends on the proof regarding Askin's and ACM's participation in the conduct that forms the linchpin of the *in pari delicto* doctrine. Ideally, if the trustee pursues the Brokers for the same wrongdoing, the actions should be tried together to avoid the possibility of inconsistent results.

15. We also reject the trustee's argument that the "adverse interest" exception prevents Primavera from imputing the Askin Parties' wrongdoing to Granite. New York law does not impute the acts and knowledge of the agent who engages in a scheme to defraud his principal on his own behalf or on behalf of another. *Center v. Hampton Affiliates, Inc.,* 66 N.Y.2d 782, 784, 488 N.E.2d 828, 829, 497 N.Y.S.2d 898, 899–900 (1985). To come within the exception, the agent must totally

abandon his principal's interest and act entirely for his own or another's benefit; the exception does not apply simply because the agent has a conflict of interest or does not act primarily for his principal. *In re Wedtech Corp.,* 138 B.R. at 9; *In re Maxwell Newspapers, Inc.,* 164 B.R. at 867; *Center v. Hampton Affiliates, Inc.,* 66 N.Y.2d at 784–85, 488 N.E.2d at 830, 497 N.Y.S.2d at 900.

At most, the complaint implies that ACM solicited investments to earn large money management fees. (See Primavera Compl. ¶ 19). While this provides ACM and Askin with a personal interest in raising money, it does not necessarily conflict with the duty to exercise due care in managing the funds. The complaint does not allege facts suggesting that ACM or Askin sought to defraud or intentionally injure Granite as opposed to Granite's investors, or that they "abandoned" Granite.

cipals. 72 F.3d at 1095. In addition, it alleged that the more sophisticated and experienced Arthur Andersen better understood the impact of the losses in many of the real estate syndications, and actively participated in the preparation of various private placement memoranda. *Id.*

The Court concluded that the complaint failed to meaningfully allege "domination and control." *Id.* The control allegations were contradicted by more specific allegations or facts subject to judicial notice. Business people often hire knowledgeable professionals to assist them. *Id.* Further, Colonial's principals or the entities they controlled served as general partners of the real estate limited partnerships that Colonial syndicated. *Id.* Both Colonial and Andersen manipulated the financial forecasts and knew that the limited partnerships could not generate sufficient income to meet their commitments to investors. *Id.* Moreover, the complaint described Colonial and its principals as "Ponzi Participants" and the principals had pled guilty to multiple felonies based on their involvement in Colonial's activities. *Id.*

The Primavera complaint also fails to allege the type of domination and control necessary to exclude the application of *in pari delicto.* Its complaint alleges that Askin and ACM controlled Granite, (Primavera Compl. ¶ 66), and the Brokers, in turn, controlled Askin and ACM:

> 68. The Broker Defendants, and each of them, controlled the business operations of Askin and ACM because Askin and ACM were solely and exclusively dependent on the existence and availability of the securities created by the Broker Defendants to run the Granite Funds. Absent these securities being created and sold to the Granite Funds, Askin and ACM would not have been engaged in the business of operating the Granite Funds.

At most, these allegations indicate that the Brokers monopolized the market in which Askin and ACM traded. Yet, the Brokers did not serve as officers or directors of Gran-

ite; Askin and ACM did. More important, the Brokers did not coerce Askin or ACM to engage in derivative trading. They voluntarily did so, and touted their acumen without any encouragement or assistance from the Brokers. Finally, unlike Hirsch's allegations against Arthur Andersen, the Primavera complaint does not allege that the Brokers helped prepare the fraudulent materials that the Askin Parties disseminated.

■ Our conclusion that the trustee cannot assert the Primavera claims against the Brokers does not apply to the Primavera claims against Askin and ACM for waste, mismanagement and breach of fiduciary duty to Granite. *In pari delicto* bars claims against third parties, but does not apply to corporate insiders or partners. Otherwise, a trustee could never sue the debtor's insiders on account of their own wrongdoing. As we have stated, only the trustee has standing to sue insiders—which we assume Askin and ACM to be [16]—for injuries to a corporation or a limited partnership arising from their waste, mismanagement or breach of fiduciary duty.

### 4. The Wrongful Liquidation Claims

■ Primavera's Eighth Claim—that the Brokers liquidated the portfolios in a commercially unreasonable manner and in violation of the Uniform Commercial Code ("UCC") [17]—is property of the estate. UCC § 9–504(3) authorizes the secured party to sell the collateral at a public or private sale, and states that "[u]nless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the ... sale or other intended disposition ... shall be sent by the secured party to the debtor...." If the secured party disposes of the collateral in violation of Article 9's liquidation provisions, UCC § 9–507(1) grants to "the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to

---

16. Askin appears, both from the Primavera complaint and the debtors' Statements of Financial Affairs, to be the only individual who controlled Granite. Askin also controlled ACM.

17. Primavera's complaint refers to violations of New York's Uniform Commercial Code. We assume for the purpose of analysis that New York law governs the propriety of the liquidation.

disposition" the right to recover damages from the secured party.

Prior to bankruptcy, the owner of the collateral (generally, as here, the debtor) can assert a claim for damages under UCC § 9–507. Hence, once bankruptcy commences, the claim passes to the estate, and the trustee can assert it. *See MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.*, 882 F.2d 615, 621 (2d Cir.1989); *Erlanger & Co. v. Lawson (In re Ramco/Fitzsimons Co.)*, 1991 WL 4813 at *3 (W.D.N.Y. Jan. 10, 1991); *Springs Credit Union v. Crandall (In re Crandall)*, 1 B.R. 752, 754–55 (Bankr. W.D.Mich.1980). Further, Primavera does not allege in its complaint that it was entitled to notification of the disposition, and this entitlement is the *sine qua non* of standing to sue for damages. *See Hong Kong & Shanghai Banking Corp. v. HFH USA Corp.*, 805 F.Supp. 133, 146 (W.D.N.Y.1992). Finally, the wrongful liquidation claims, like the churning claims in *Wagoner*, are distinct from the other claims, and the complaint does not allege that any of the Askin Parties participated in the "fire" sale of the portfolios. Therefore, Primavera's assertion of its Eighth Claim violates the automatic stay.[18]

### 5. The Breach of Contract Claim

Finally, Primavera alleges a separate (Seventh) claim against the Brokers, as third party beneficiaries, for breach of the margin and reverse repo contracts between Granite and the Brokers. The breaches include the failure (1) to extend credit in a reasonable manner, (2) to fairly and reasonably mark the Granite securities, (3) to liquidate the collateral in a fair and reasonable manner, and (4) self dealing in connection with the Brokers' purchase of the collateral. (Primavera Compl. ¶¶ 107–13). Although Primavera has alleged its own standing, it is not clear that it, or the class members, have it. Even if they did, the assertion of the third party beneficiary claims ordinarily violates the automatic stay. The contract claims belong to the trustee, and Primavera has not alleged a special injury. Further, an adverse judgment against Primavera would bar the trustee's action, and discharge the Brokers. *See* Restatement (Second) of Judgments § 56, cmt. a, illus. 2 (1982).

Some difficulty arises, however, from the effort to distinguish the contract claims from Primavera's other claims. The contract claims correspond to the claims elsewhere that the Brokers aided and abetted various breaches of fiduciary duty, mismanagement, waste and fraud, and liquidated the portfolios in a commercially unreasonable manner. The claims of breach of contract, breach of fiduciary duty and aiding and abetting a fraud "allege what is essentially 'a single form of wrongdoing under different names.'" *Wedtech Corp. v. KMG Main Hurdman (In re Wedtech Corp.)*, 81 B.R. 240, 241 (S.D.N.Y. 1987) (quoting *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 453 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982)); *accord Hirsch v. Arthur Andersen & Co.*, 72 F.3d at 1092.

■ We have already concluded that some of the analogous claims—those concerning the liquidation of the Granite portfolios—belong to the trustee. Primavera cannot circumvent the trustee's rights by alleging the same wrongdoing under a different legal theory. Conversely, we have determined that *in pari delicto* prevents the trustee from raising certain other claims also included in Primavera's contract claim. These include allegations that the Brokers unreasonably extended credit or improperly marked the securities in the Granite portfolio. Although *in pari delicto* may not apply to bar contract claims, the same conduct may nonetheless provide a defense to a breach of contract action. *See In re Mediators, Inc.*, 190 B.R. at 530–31.

---

18. None of the parties have discussed the relationship between the investors' fraud claims and the trustee's wrongful liquidation claims. Specifically, the parties have not addressed whether the damages recoverable under the two theories "overlap." If so, the investors may have to await the outcome of the prosecution of the wrongful liquidation claim before they can fix their damages caused by the fraud. *See Bankers Trust Co. v. Rhoades*, 859 F.2d at 1106. Since, however, none of the parties have raised or briefed this issue—nor is it clear that this is the appropriate court in which to do so—we decline to reach it.

■ We conclude that any contract claims should follow our disposition of the related, non-contract claims. Accordingly, Primavera cannot assert third party beneficiary claims regarding the liquidation of the portfolio, but can assert claims, based on breach of contract, if *in pari delicto* bars the trustee from challenging the same wrongdoing under a different legal theory. This does not mean that we agree with Primavera that it is a third party beneficiary, or that it has standing to assert the claims we have carved out. We have not even seen the contracts on which it relies, and there is no evidence that Granite intended or did not intend to benefit its investors when it entered into these contracts. Whether Primavera has stated a third party beneficiary claim in its district court complaint is best left to the district court presiding over that action.

## C. The TAG Third Party Complaint

The second pleading that the trustee challenges is the third party complaint (the "TAG Compl.") filed by TAG Associates and Mark Friedman and Andrew Malloy, TAG's managing directors (collectively, the "TAG Parties"), against Askin, ACM and Bradshaw–Mack, *i.e.*, the Askin Parties. TAG provides financial advisory services. In the primary complaint, James Gray, a former client of TAG, charged the TAG Parties with negligent misrepresentation, negligence, breach of contract and breach of fiduciary duty.[19] In substance, Gray alleged that the TAG Parties, with knowledge of Gray's conservative investment goals, nonetheless recommended that he invest in Granite. Gray followed this advice and invested $1 million in Granite Partners. In their third party complaint, the TAG Parties seek contribution and indemnity from the Askin Parties. Since we base our decision solely on what it alleges, we must avoid the temptation to read the third party complaint through the prism of Primavera's more extensive allegations.

The third party complaint consists of two component claims. It primarily charges that the Askin Parties fraudulently induced TAG to recommend an investment in Granite Partners. Askin and Bradshaw–Mack described their method of hedging which immunized the portfolio from the negative effects of interest rate fluctuations (TAG Compl. ¶ 13), their ability to precisely identify the market behavior of the securities they traded, (*id.* ¶ 14), and their use of analytical computer models and various hedging techniques to implement the market neutral strategy (*Id.* ¶ 15.)

■ This claim does not belong to the trustee. It is identical to the fraudulent inducement claim raised by Primavera, and Gray, like Primavera could probably have asserted it directly against the Askin Parties. Without deciding the sufficiency of the third party claim, we conclude that the TAG Parties did not violate the automatic stay by including this claim in their third party complaint.

■ The TAG Parties also allege a separate claim sounding in breach of fiduciary duty and mismanagement. According to their third party complaint, ACM and Askin breached their fiduciary duty to Gray, and acted negligently and fraudulently, by making investments which were not part of the market neutral strategy they said they would follow. (TAG Compl. ¶¶ 27, 28). As we have already observed, such claims belong to the partnership. Gray could not maintain these claims directly against Granite's insiders, and the TAG Parties cannot maintain them under the guise of claims for contribution and indemnity. We reach the same conclusion if we view the TAG Parties as creditors of Granite Partners.[20] *See In re Keene Corp.*, 164 B.R. at 853–54 (claims against officers and directors for breach of fiduciary duty are property of the estate, and once bankruptcy ensues, and absent abandonment or relief

---

19. James L. Gray is a plaintiff in an action entitled *ABF Capital Management, et al. v. Askin Capital Management, L.P., et al.* filed in New York State Supreme Court on or about March 26, 1996. This action, filed by investors in the Granite funds, alleges many of the same wrongs alleged in the Primavera and TAG complaints.

20. On February 6, 1995, TAG Associates filed a contingent and unliquidated proof of claim for indemnification and contribution in Granite Partners' case.

from the automatic stay, the creditors are barred from asserting them).

## D. The Malkani Arbitration

The third and final proceeding we must address is an arbitration. Roma Malkani and Information Systems & Networks Corp. (collectively, the "Claimants") filed an arbitration demand in February, 1995 against Askin, ACM and Granite Partners. The demand alleged that Askin controlled ACM, and that Askin and Granite fraudulently induced the Claimants to purchase limited partnership interests "by making false representations such as the fund being interest market neutral, as well as omitted material facts such as the fund being high leveraged." The Claimants seek an award of $680,000.00. The Claimants also filed a single document entitled "Proof of Claim and Proof of Interest" in Granite Partners' case.

 The Claimants have not responded to the trustee's motion. In addition, our review of the docket sheet indicates their failure to answer the complaint or make an appropriate motion in lieu of answering. They are in default and failure to oppose the trustee's motion allows us to conclude that they have waived any opposition to the entry of the preliminary injunction. *See Kersh v. Borden Chem., Inc.,* 689 F.Supp. 1442, 1451 (E.D.Mich.1988); *cf. Shapiro, Bernstein & Co. v. Continental Record Co.,* 386 F.2d 426, 427 (2d Cir.1967) (district court erred in denying application for preliminary injunction where corporate defendant ignored direction to designate attorney). In addition, their demand acknowledges that Granite Partners filed a bankruptcy petition, and states that it "is named only for completeness." The Bankruptcy Code does not recognize a "completeness" exception to the automatic stay, and the joinder of Granite Partners violated 11 U.S.C. § 362(a). Accordingly, the trustee's motion for preliminary injunctive relief is granted as against the Claimants.

## E. The Insurance Claims

 The trustee also alleges that the Primavera and the other third party proceedings adversely affect Granite's rights under certain insurance policies. Accordingly, argues the trustee, the automatic stay bars these proceedings. The facts regarding these policies and Granite's rights are not in dispute.

At the time of the filings, there were two relevant policies in effect. The first, the Funds/ACM policy, was issued to Granite Partners, Granite Corporation and ACM, but Quartz is also covered. It consists of two components: indemnification and liability. In simplest terms, it covers losses [21] arising from conduct by the general partners if the general partners [22] are entitled to indemnification from Granite. This is the so-called indemnification coverage. It also insures the general partners against any loss arising in their capacity as general partners. This represents liability coverage which runs solely to the benefit of, in this instance, the Askin Parties.

The second relevant policy is the ACM Investment Advisor policy. It pays on behalf of ACM any loss arising from a claim made against ACM or any past or present partner, officer, director or employee against whom a claim is made in that capacity for whose action ACM is legally responsible. Granite has no interest in the ACM Investment Advisor policy or in its proceeds. Both policies, however, share an aggregate $5 million cap. Accordingly, a payment under the ACM Investment Advisor policy reduces, dollar for dollar, coverage under the Funds/ACM policy. The trustee submitted an affidavit stating that only $2 million of total coverage remains under the two policies.

The Funds/ACM policy insures Granite against indemnity claims by the Askin Parties. In addition, the Granite Partners Limited Partnership Agreement and the Granite Corporation and Quartz Articles of Associa-

---

**21.** The "losses" include damages, judgments, settlements, including attorneys fees, costs and expenses, incurred in connection with the defense (or appeal) of any real or threatened action.

**22.** The term "general partners" includes the actual general partners and the officers and directors of the corporate general partner. There appears to be no dispute that it covers the Askin Parties.

tion all contain some form of indemnification provision, and ACM's investment advisory agreements with Granite contain separate indemnification provisions. ACM has filed proofs of claim in each of the cases asserting claims for indemnification, and we assume for the purpose of the trustee's motion that the trustee could look to the Funds/ACM policy to satisfy the indemnification claims.

The initial question posed by the trustee's motion is whether the third party actions against the Askin Parties violate the automatic stay because of the way that they affect Granite's indemnification insurance coverage. We begin our answer with the basic definition of "property of the estate." The commencement of the case creates an estate that includes, with certain limitations, all of the debtor's property. 11 U.S.C. § 541(a). Further, section 362(a)(3) stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." This section prevents dismemberment of the estate, ensures orderly liquidation, and grants the trustee time to familiarize himself with the various rights and interests involved and the property available for distribution. H.R.Rep. No. 595, 95th Cong., 1st Sess. 341 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 50 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

■ A debtor's rights under an insurance policy are property of the estate. *Johns–Manville Corp. v. Asbestos Litig. Group (In re Johns–Manville)*, 26 B.R. 420, 436 (Bankr. S.D.N.Y.1983), *aff'd in part,* 40 B.R. 219 (S.D.N.Y.), *rev'd in part on other grounds,* 41 B.R. 926 (S.D.N.Y.1984). This pronouncement has led most courts to analyze facts similar to the present case under the automatic stay provisions, and they have reached divergent results simply by viewing the same problem from different viewpoints. The trustee cites a line of authority holding that suits by non-debtors against non-debtors that interfere with the debtor's right to insurance proceeds violate the automatic stay. *See, e.g., Circle K Corp. v. Marks (In re Circle K Corp.)*, 121 B.R. 257, 261–62 (Bankr.D.Ariz. 1990) (also deciding, in the alternative, that the debtor was entitled to an injunction un-

der the reasoning of *Manville*); *cf. In re Minoco Group of Companies, Ltd.,* 799 F.2d 517, 519–20 (9th Cir.1986) (insurer's cancellation of the directors' and officers' liability policies violated automatic stay because they provide indemnification coverage to the debtor); *Pintlar Corp. v. Fidelity & Casualty Co. (In re Pintlar Corp.)*, 175 B.R. 379, 385 (Bankr.D.Idaho 1994) (insurer's coverage action violated the automatic stay because if the officers and directors are denied coverage, the debtor will have greater difficulty collecting damages and increase the debtor's indemnification obligations). The rationale of these cases is as follows: under a policy, like the Funds/ACM policy, every dollar paid to cover the director's liability (or to indemnify them for their litigation expenses) reduces, by one dollar, the remaining coverage available for indemnification. If the insurance is insufficient to pay all covered claims, such payments will reduce the amount of coverage available to the debtor, and this violates section 362(a)(3).

Primavera points to another line of cases that reach the opposite result. These cases distinguish between ownership of the policy and the right to receive the proceeds, and hold that an action against officers or directors covered by the liability policy, which also covers the debtor against indemnification, does not implicate "property of the estate" or the automatic stay because the debtor has no interest in the liability proceeds. *See e.g., In re Daisy Sys. Sec. Litig.,* 132 B.R. 752, 755 (N.D.Cal.1991); *Duval v. Gleason,* 1990 WL 261364 at *5 (N.D.Cal.1990); *cf. Louisiana World Exposition, Inc. v. Federal Ins. Co. (In re Louisiana World Exposition, Inc.)*, 832 F.2d 1391, 1400 (5th Cir.1987) (concluding that insurer's payment of litigation costs incurred by debtor's former officers and directors defending suit brought by committee did not threaten indemnification coverage because payment of costs reduced potential indemnification claim dollar for dollar). These cases find no legal significance in the interrelationship between the liability and indemnification coverage, and focus solely on the specific proceeds directly affected by the litigation.

We take yet another viewpoint which we believe to be consistent with the case law that initially breathed life into these principles. We think that the issue is not whether the automatic stay applies, but whether it should be extended under section 105(a) of the Bankruptcy Code.[23] In *Johns–Manville,* 26 B.R. 420, the debtor, an asbestos manufacturer, sought an injunction, *inter alia,* against a proposed class action law suit brought against the debtor's officers and directors under the federal securities laws. *Id.* at 428. The debtor had various insurance policies that covered its officers' and directors' liability and also provided indemnification coverage to the debtor.

The *Manville* court did not decide, as some of the later cases might suggest, that the automatic stay "automatically" applied to the shareholders' lawsuit. Rather, the bankruptcy court extended the automatic stay under section 105(a) because it was necessary and appropriate to carry out the purposes of the automatic stay. In reaching this decision, the court found that the shareholders' lawsuit was designed to circumvent the automatic stay by suing the officers and directors when the real party in interest was Manville. 26 B.R. at 428. In addition, an adverse judgment would increase the debtor's indemnification liability. *Id.* at 429. To the extent the insurance companies failed to pay the defense costs, or the costs exceeded the policy limits, "an asset of the estate is diminished and Manville's exposure in other litigations increases." *Id.* Further, the debtor might be collaterally estopped from relitigating issues determined adversely to the officers and directors. *Id.* Finally, the continued litigation burdened the debtor, and forced it to divert its manpower and efforts from reorganizing its business to defending litigation. *Id.* at 429–30.

In *A.H. Robins Co. v. Piccinin (In re A.H. Robins Co.),* 788 F.2d 994 (4th Cir. 1985), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986), the Fourth Circuit applied the *Manville* rationale to the Dalkon Shield-related litigation against the debtor's principals. It upheld the district court's injunction based upon the findings below. These included the following: the principals were entitled to indemnity and had rights as additional insureds under the debtor's insurance policy, the insurance represented a limited fund covering thousands of product liability actions against the debtor, the continuation of the third party actions would thwart the debtor's reorganization efforts, and finally, if the suits continued against the indemnitees, the debtor might be bound by those results, or inconsistent judgments might result. *Id.* at 1008.

*Manville* and *A.H. Robins* stand for the proposition that the court can and should enjoin suits by third parties against third parties if they threaten to thwart or frustrate the debtor's reorganization efforts. The issuance of the injunction involves consideration of many factors. These include whether the suits threaten the debtor's insurance coverage or increase the debtor's indemnification liability, as well as the other factors the two courts discussed. This implies that the mere threat to the policy does not implicate the automatic stay, and that the Court should not extend the automatic stay if that is the only "injury" that the debtor can show. In this regard, the debtor's insurance policy is property of the estate as is its contractual right to indemnification coverage under the policy. The directors' and officers' contractual right to liability coverage, however, is not. We are not convinced that an

**23.** Section 105(a) authorizes the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." It is a broad grant of power that exceeds the limits of the automatic stay, and empowers the bankruptcy court to "use its equitable powers to assure the orderly conduct of the reorganization proceedings." *Erti v. Paine Webber Jackson & Curtis, Inc. (In re Baldwin–United Corp. Litig.),* 765 F.2d 343, 348 (2d Cir.1985); *accord Garrity v. Leffler (In re Neu-*

*man* ), 71 B.R. 567, 571 (S.D.N.Y.1987). Under Section 105, the bankruptcy court can issue an injunction to restrain activities that threaten the reorganization process or impair the court's jurisdiction with respect to a case before it. *Manville Corp. v. Equity Sec. Holders Comm. (In re Johns–Manville Corp.),* 801 F.2d 60, 64 (2d Cir. 1986); *LTV Steel Co., Inc. v. Board of Educ. (In re Chateaugay Corp., Reomar, Inc.),* 93 B.R. 26, 29 (S.D.N.Y.1988); *Keene Corp. v. Acstar Ins. Co. (In re Keene Corp.),* 162 B.R. 935, 944 (Bankr. S.D.N.Y.1994).

action by a third party to recover a judgment against another third party, whose liability may be covered under an insurance policy that also grants the debtor separate rights, implicates the automatic stay.

We conclude, therefore, that the automatic stay does not bar these lawsuits on this separate ground involving the debtor's insurance coverage. In addition, the trustee has failed to prove his entitlement to an injunction under the principles established in *Manville* and *Robins*. The trustee's motion states, in conclusory terms, that the estates will suffer irreparable injury because the third party lawsuits will deplete estate assets, potentially prejudice subsequent lawsuits against the Brokers and the Askin Parties, and prevent him from reaching a settlement in the form of a consensual plan. *Trustee's Motion for Order Preliminarily Enjoining Defendants From Commencing, Maintaining, and Prosecuting Litigation Against Non–Debtor Parties,* dated Dec. 21, 1995, at ¶ 18.

The trustee's proof falls well short of what he must show; he has not shown that the continuation of these lawsuits will frustrate or thwart the reorganization because of their effect on Granite's insurance coverage, or for any other reason. It is true that here, as in *Manville,* the claims asserted against the Askin Parties are the same as the claims asserted in the proofs of claim filed by Primavera and TAG. Yet the Askin Parties would be individually liable for any fraud that they committed. In addition, the prosecution of these claims will doubtless increase Granite's uninsured indemnification obligation. Yet that will be true in almost every instance in which creditors of a debtor corporation sue its officers and directors who were prescient enough to purchase this common type of insurance. Directors and officers contemplating a corporate bankruptcy could insulate themselves from most post-bankruptcy lawsuits—if they had not already done so—simply by purchasing the precise type of insurance designed to protect them in the event of such a lawsuit. This is not the

kind of "insurance" the policy is designed to afford.

More important, there are substantial differences between this case and the *Manville* and *Robins* cases which militate against injunctive relief. Granite does not operate, and the trustee is liquidating their assets. He does not need the Askin Parties to focus on the reorganization. Further, the trustee has not argued that an adverse judgment would collaterally estop him in subsequent litigation, except to include a parenthetical description of a holding added to a case citation that appears in the final footnote of the final page of the trustee's memorandum of law.

In reaching our conclusion, we cannot ignore the pace of this case. It is now two years old, and the trustee has been investigating Granite's affairs for eighteen months. He has not filed a plan, he has not commenced any lawsuits and he has not announced any consensual agreements with the Brokers or the Askin Parties. We recognize his desire to be thorough and complete, and do not mean to criticize him. Rather, we simply point out that he has had ample time to do the things that the *Manville* and *Robins* courts feared the third party lawsuits might prevent or inhibit. If the reorganization is being frustrated and thwarted, the trustee has failed to prove that these lawsuits, or the further diminution in the remaining amount of indemnification insurance,[24] is a contributing factor.

## F. The Claims Based on Partnership Law

▉ The trustee also asks us to enjoin the third party claims to preserve Granite Partners' claims against ACM under partnership law. ACM is Granite Partners' sole general partner. Under Delaware partnership law, ACM is individually liable for Granite Partners' debts. The trustee reasons that ACM's assets should be applied to satisfy the claims of Granite Partners, and in support, cites *Litchfield Co. of S. Carolina*

---

24. In this regard, the trustee did not seek an injunction until only $2 million in coverage remained from the original $5 million. The trustee did not explain why he waited until now to seek an injunction, but we infer from the delay that the insurance coverage does not play a significant role in the formulation of Granite's plans.

*Ltd. Partnership v. Anchor Bank (In re Litchfield Co. of S. Carolina Ltd. Partnership )*, 135 B.R. 797 (W.D.N.C.1992); *Myerson & Kuhn v. Brunswick Assocs. Ltd. Partnership (In re Myerson & Kuhn )*, 121 B.R. 145 (Bankr.S.D.N.Y.1990); *Lesser v. A–Z Assocs. (In re Lion Capital Group )*, 44 B.R. 690 (Bankr.S.D.N.Y.1984).

These cases do not support the trustee's argument. In the first two cases, the courts granted the injunction to preserve the general partners' assets because the general partners both had assets, and had made a commitment to contribute their assets to the reorganization. *In re Litchfield Co. of S. Car. Ltd. Partnership*, 135 B.R. at 801–02; *In re Myerson & Kuhn*, 121 B.R. at 152; *accord Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir.1993) (*Litchfield* decision based on general partner's promise to contribute his assets to reorganization); *Veeco Inv. Co. v. Mercantile Nat'l Bank (In re Veeco Inv. Co.)*, 157 B.R. 452, 455 (Bankr.E.D.Mo.1993) (the court granted the injunction in *Myerson & Kuhn* because reorganization was dependent on the financial contribution from the partners). The trustee does not offer any proof that ACM has assets, or intends to contribute to the plan. Further, the statements of the *Lion Capital* court on which the trustee relies are *dicta. See* 44 B.R. at 702. Finally, although the *Litchfield* court also held that the partnership's bankruptcy automatically stayed the creditor's actions against the general partners, *see* 135 B.R. at 804–05, this conclusion contravenes Second Circuit precedent. *Teachers Ins. & Annuity Ass'n v. Butler*, 803 F.2d 61, 65 (2d Cir.1986).

In addition, the trustee also fails to explain how he intends to bring ACM's assets into the Granite Partners estate to satisfy creditors' claims. Granite Partners is not a chapter 7 case in which the Bankruptcy Code grants the partnership trustee a statutory claim to recover any deficiency from the partners. *See* 11 U.S.C. § 723. Further, the trustee has not sued ACM, or indicated that he intends to do so. The investors, on the other hand, have independent claims against ACM, and at present, they appear to be the only parties intent on pursuing them.

## CONCLUSION

To recapitulate, the Primavera and TAG claims against the Brokers and the Askin Parties that sound in fraudulent inducement are not property of the estate and will not be enjoined. This conclusion also applies, for different reasons involving *in pari delicto,* to Primavera's claims that the Brokers aided and abetted, or participated with Askin and ACM, in the latter's acts of waste, mismanagement and breach of fiduciary duty, and any related third party beneficiary contract claims. The Primavera and TAG claims charging Askin and ACM with waste, mismanagement and breach of fiduciary duty belong to the trustee as does Primavera's claim that the Brokers liquidated the Granite portfolios in a commercially unreasonable manner. The assertion of these claims violated the automatic stay, and the trustee is entitled to an injunction against their continuation. Finally, the trustee is entitled to an injunction against the continuation of the arbitration.

The parties are directed to settle an order consistent with this decision.